## MATAKIEFF *v.* MATAKIEFF

[No. 53, September Term, 1966.]

24

*Decided March 13, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, OPPENHEIMER, BARNES and FINAN, JJ.

*Cyrus A. Ansary* for appellant.

Submitted on brief by *George L. Quinn, Jr.* and *Esther Cady Quinn* for appellee.

FINAN, J., delivered the opinion of the Court.

Apostol H. Matakieff, appellant, a citizen of Bulgaria, who was residing in Montgomery County at the time of the filing of the bill of complaint by the appellee, is appealing from a decree of the Circuit Court for Montgomery County granting the appellee, Madeleine N. Matakieff, his wife, a decree *a vinculo matrimonii* on the ground of desertion, and dismissing his cross-bill charging adultery. The decree also awarded the custody and

guardianship of the minor child, Tanya Matakieff, to the appellee with reasonable visitation privileges reserved to the appellant; it also ordered the appellant to pay the sum of $200 per month to the appellee for the support and maintenance of the minor child and $100 per month as alimony, dating from January 19, 1966; the sum of $300 additional solicitor's fee for the appellee's attorney and the sum of $6,110 to the appellee, representing alimony *pendente lite* and support and maintenance for the minor child found to be due and owing under an order of court dated June 10, 1963.

The couple were married in Montgomery County on November 8, 1958; one child, a daughter, was born on May 4, 1959. The appellee also had a minor daughter by a previous marriage who lived with them. The husband was a salesman, sometimes of automobiles, sometimes of Fuller brushes, the wife a part-time elementary school teacher and secretary. Frequent arguments punctuated the marriage idyl, the wife alleging that the husband had temper tantrums which would culminate in his striking her and at times their daughter; also the husband would frequently leave the home for a day or two. At least on one occasion, his physical violence to the wife prompted her to call the police, who upon arrival did not arrest the husband but lectured him that in America a man had to treat his wife in a more considerate fashion than had been his custom, gallantly admonishing him, "that you don't hit a woman in Maryland." The wife testified that the husband also threatened to take the child out of the country. The wife claims that they ceased having sexual relations in December of 1962, and thereafter the husband's absences from home, for one and two day periods, became more frequent and even during the occasions that he was home, he wouldn't speak to her. Finally in April of 1963, the husband left and did not return until May 9, 1963, at which time the wife would not admit him to the apartment. She testified that at the time one daughter had just recovered from the measles and the other one had just contracted them. The husband returned the next night and kicked in the door. The wife called the police, but since the couple were not legally separated they did not make the husband leave. The husband remained for almost fifteen days, sleeping on a sofa in one room,

she occupying another. The wife maintains there was no sexual relations between them during this period.

She filed her bill of complaint for a divorce *a mensa et thoro* on May 14, 1963, and left their abode about 15 days thereafter, taking the children with her. She stayed with a friend in Silver Spring until June 10, 1963, and then went to her mother's home in New Jersey. On June 14, 1963, the husband sent her a telegram to her mother's address in New Jersey telling her to get her belongings out of the Bradley Boulevard apartment by June 18, 1963.

In September 1963, she returned to Maryland renting an apartment in Adelphi, Prince George's County, which she occupied until July 27, 1965. She obtained employment with a law firm in Hyattsville. During much of this period the husband made weekly visits to the Adelphi apartment to see his daughter and bring money to apply towards his payments of alimony *pendente lite* and support for the child, although in this respect he became substantially in arrears. On occasions he took the family out to dinner.

The appellant, giving his version of events, testified that during the year 1964, he was transferred to Washington by the Fuller Brush Company and that he made three or four visits a week to the Adelphi apartment and spent the week-ends there, sharing the same bed with his wife, (which the wife in her testimony categorically denied) and that this continued until May 15, 1965, when his discovery on the scene of the alleged paramour, Glidden, brought his visits to an abrupt termination. On this latter occasion he testified that he went to the Adelphi apartment around midnight and knocked on the door and nobody answered. He was in the process of entering through a window in the bedroom where the children slept when he heard a door opening and slamming and saw a man dressed in a T-shirt run out into the street. He pursued him for a quarter of a mile before catching him. The man, who would not identify himself, turned out to be Glidden.

On May 20, 1965, appellant testified that while peeping through the venetian blinds of his wife's apartment, he saw appellee and Glidden sitting on the couch in the living room at 1:30 a.m.—she had her head on his shoulder. The lights

were on, but were turned off at 2:30 a.m. and Glidden was still there.

The husband then secured the services of a private detective agency. Investigator Davison testified that on June 6, 1965 at 10:00 p.m., Glidden and appellee entered the Adelphi apartment together. At this time the lights were on in the front bedroom but five minutes later the lights were turned off and the room remained in darkness until 11:45 p.m. The couple then emerged from the apartment and walked arm in arm to the laundry room. They returned at 12:15 a.m., carrying baskets of laundry. Ten minutes later they again emerged from the apartment and went to appellee's car from which they took a tire and carried it over to Glidden's car. They did not kiss but hugged each other for about a minute. Glidden then left.

On June 17, 1965, Davison again observed the Adelphi apartment. The master bedroom was dimly lighted and from a window observation, the investigator heard a man's voice. Glidden left at 1:50 a.m. Appellee walked to the doorway and kissed Glidden good night.

On June 19, 1965, Davison again observed Glidden and appellee in the apartment from 10:00 p.m. until 3:30 a.m. when his observation ceased.

On June 18, 1965, investigator Alfred Milburn observed Glidden, the appellee and her two children eating dinner at the Shore Club where they left at 10:45 p.m. Glidden carried one of the children. They drove off in Glidden's car with appellee sitting close to him. Investigator Charles Milburn later observed Glidden, appellee and the two children entering Glidden's house after leaving the Shore Club. All lights were turned off and no one else entered or left before 3:00 a.m. when the vigil was discontinued.

On June 19, 1965, Alfred Milburn observed Glidden enter the Adelphi apartment at 10:00 p.m.; at 12:28 a.m. Glidden came out and went to his car and got what appeared to be a bottle and returned to the apartment; the appellee waited for him in the doorway. At 2:04 a.m. appellee came out of the apartment and looked around and then re-entered immediately. At 2:07 a.m. the lights were put out; at 4:20 a.m. when the watch was discontinued, Glidden had not left.

A fourth investigator, Anton Fanflik, corroborated the observations of June 17, 18 and 19th, 1965.

Mrs. David R. Cromer, a neighbor and disinterested witness, testified that in May or June, 1965 Glidden commenced visiting the appellee's apartment four to five times a week.

The appellee, after hearing the testimony of the appellant's witnesses, took the stand in rebuttal. She denied that any improper conduct transpired between her and her alleged paramour, Glidden. She stated that he was a garage mechanic that she had met. She did not deny his presence in her home on the occasions testified to by the private detectives, stating that his presence in the apartment was for the purpose of protecting her from the appellant. Nor, did she specifically deny kissing or hugging Glidden or sitting close to him in his automobile on the occasions testified to by the detectives. Although denying that Glidden had stayed with her too late, her recollection of specific dates was vague. Pertinent parts of her testimony were as follows:

Q. How did you come to know Mr. Glidden?
A. One day he worked on my car. He worked at the automobile shop and I had known him for about a year and on one occasion I had stopped and talked to him after work and he told me that he had been divorced and he asked me if I would like to have a meal with him sometime, because I told him I was separated and every day I would see him, that's all.

           * * *

Q. THE COURT: Well the time did come according to this witness when this man stayed until 4:30 or 4:00 a.m. and then he left.
A. THE WITNESS: I don't think he was ever there that late, he was there late once or so but not that late.
Q. THE COURT: I am just saying in accordance with this testimony as it is here, he did on the 19 of June indicate that he left at 4:20 a.m. and that the night of the Shore Club that he watched his house

until about 3:30 a.m. and that on June 6 Mr. Davison testified that at 11:40 a.m. he left the apartment and came back at 12:14 and you hugged him and at 2:07 he left. Do you want to—

A. THE WITNESS: I don't recall that it was ever at 4:00 in the morning. We came home very late and maybe he would accompany me into the house and he was there maybe fifteen minutes and if the lights were out in there it was because we weren't there. At 3:15 I don't recall that it was ever 4:20 in the morning, I don't think it was ever that late, *it was possible that it would be 3:15 or even 3:30 but not later, we sometimes went to the drive-in and it was not over until about 3:00.* (Emphasis supplied.)

Mr. Robert Glidden was also called by the appellee, and he testified that he stayed in the appellee's apartment late on one occasion only, and on other occasions he was there to repair her automobile, play cards, or look after her because there had been trouble with her husband. Glidden denied they had ever been partners in adultery.

The aforegoing are the rather sad and unglamorous facts of the case. How then do they square with the law?

This Court has repeatedly held that adultery may be proved by circumstantial evidence. In *Kremelberg v. Kremelberg,* 52 Md. 553 (1879), this Court stated at p. 555:

"Direct proof, that is, the evidence of eye-witnesses, is not required, for such is the nature of the offense and the secret and clandestine manner in which it is committed, that proof of this kind is in most cases unattainable; yet where it is sought to be inferred from circumstances, the latter must lead to the conclusion of guilt by fair inference, as a necessary conclusion. *Loveden v. Loveden,* 4 Eng. Ecc. 461."

The elements required for circumstantial evidence to sustain proof of adultery have often been stated by this Court. In *Dougherty v. Dougherty,* 187 Md. 21, 48 A. 2d 451 (1946), Judge Delaplaine speaking for the Court, said at pp. 27-8:

"To prove adultery, the circumstantial evidence must clearly establish (1) a disposition on the part of the defendant and the paramour to commit adultery, and (2) an opportunity to commit the offense. After considering these and all other facts and circumstances in the case, the court then determines whether the evidence would convince an unprejudiced and cautious person of the guilt of the defendant."

*Blankenship v. Blankenship,* 239 Md. 498, 510, 212 A. 2d 294, 300 (1965) ; *Abare v. Abare,* 221 Md. 445, 450, 157 A. 2d 427, 430 (1960) ; *Pohzehl v. Pohzehl,* 205 Md. 395, 406, 109 A. 2d 58, 63 (1954) ; *Burger v. Burger,* 204 Md. 495, 499, 104 A. 2d 923, 925 (1954) ; *Lickle v. Lickle,* 188 Md. 403, 407-8, 52 A. 2d 910, 911 (1947) ; and *Hockman v. Hockman,* 187 Md. 340, 344, 50 A. 2d 136, 138 (1946).

It is interesting to note that in the instant case there was no finding by the chancellor of insufficient evidence to show an adulterous disposition and the opportunity to commit the offense, but that the evidence on these two issues failed because of the lack of credibility of the appellant. The chancellor stated: "The Court is convinced that Mr. Matakieff lied on the witness stand in many areas of his testimony. The court was impressed by the frankness, demeanor and testimony of Mr. Glidden and believes his statement and Mrs. Matakieff that they did not have sexual relations." The chancellor in her opinion makes no mention or comment on the testimony of the private detectives retained by the appellant to observe the appellee's premises.

Forgetting for the moment the veracity of the appellant's testimony, this Court cannot discount the testimony of the private detectives retained by the appellant. This is particularly true when their testimony is reviewed in conjunction with that of the appellee and the alleged paramour Glidden.

The appellee by her own admission acknowledged the visits of Glidden to her apartment, his presence there at pre-dawn hours, visits to drive-in theatres at late hours, the dinner at the Shore Club, the visit to Glidden's home. Much of this was corroborative of the testimony of the detectives or perhaps it is better said that the detectives' testimony was corroborative of it.

There is also the testimony of Mrs. Cromer, a neighbor and

disinterested witness, who testified that sometime during May or June 1965, Glidden began visiting appellee's apartment three or four times a week.

So we have Glidden definitely on the scene. The private investigators testified to certain specific details of the actions of the appellee which again are corroborated by the appellee herself. For example, the detectives' testimony that, during their vigil of June 19, 1965, a night when Glidden had not left by 4:20 a.m., the appellee came out of her apartment about 2:00 a.m. and looked around the premises, which in the appellee's rebuttal testimony she admitted doing. This is certainly corroborative of the fact that the detectives were there and were accurately observing. Again, the detailed description given by the private investigators of the events concerning the evening of June 6, 1965, an evening when, they testified, Glidden was in the appellee's apartment from 10:00 p.m. to 2:00 a.m., and that during this time Glidden and the appellee walked hand in hand to the laundry room in the apartment complex, where they remained from 11:45 to 12:15 a.m. Glidden, perhaps unwittingly, corroborated this in his testimony when he said that the appellee was so frightened of her husband that she was scared to go to the "washroom" alone and then explained that he meant the "laundry room."

The Court recognizes that the testimony of opposing witnesses differ as to the length of duration of the alleged paramour's visits and the question of the lateness of his departures, yet, here again, there is no dispute that he was present at the apartment on occasions considerably after midnight. There are many areas of fact wherein the testimony of the private investigators and that of the appellee and Glidden can, upon analysis, be reconciled.

The points of similarity show that the private investigators were making the observations on the occasions enumerated and were methodically noting what they saw. Not to acknowledge this would be placing too much credence in sheer coincidence. Had the private investigators desired to lie about what they observed or sought to embellish upon their descriptions, it is doubtful they would have given the account of what transpired in such restrained language as characterizes their testimony.

This Court has previously had occasion to comment on evidence garnered by the use of private detectives, stating in *Hockman v. Hockman, supra,* at pp. 345-6:

"It is unquestionably true that the testimony of private detectives is not entitled to any more weight than that of the defendant and co-respondent, where they conflict. The reason for this rule is that they are all interested witnesses, the detectives to justify their employment by finding what they are employed to find, and the defendant and co-respondent to establish their innocence. *German v. German,* 137 Md. 424, 112 A. 789. Generally, the testimony of detectives is not reliable when it is uncorroborated by any circumstance in the case and does not connect the defendant with the offense. *McCleary v. McCleary,* 140 Md. 659, 663, 118 A. 133; *Bailey v. Bailey,* 181 Md. 385, 30 A. 2d 249; *Steinla v. Steinla,* 178 Md. 367, 13 A. 2d 534. But in this case the detective, who has an established detective agency in the Equitable Building, was accompanied by his wife when he followed Mrs. Hockman and Ridenbaugh on their motor trips, and the investigation was done thoroughly."

We feel that the investigation in this case was accomplished in a thorough manner. The testimony of the private detectives was never successfully rebutted, nor were their characters impeached. They never testified that they saw the appellee and Glidden committing adultery. However, their testimony did lay the foundation of circumstantial evidence from which the adultery could be inferred, that is: (1) an adulterous disposition; and (2) the opportunity for it to have occurred.

The testimony, taken as a whole, amply illustrates that the opportunity for the occurrence of adultery was present on several occasions and the adulterous disposition sufficient to satisfy the requirement of the law was present. Both the appellee and the alleged paramour knew of the other's marital experiences, Glidden divorced; the appellee, according to what she told him, "separated" from her husband. The appellee in her rebuttal gave no forthright denial of the accusations that she had on one oc-

casion kissed Glidden good night at the doorway of her apartment; that she had sat close to him in his automobile; that on another occasion she had given him a prolonged hug outside of the apartment prior to his leaving; nor did she give a reasonable explanation of the lateness of their trysts. *Blankenship v. Blankenship, supra.*

The testimony of the appellant was corroborated by Glidden's testimony regarding the appellant's finding him in the appellee's apartment around midnight on May 15, 1965, at which time the chase in the street ensued. The appellant's testimony that on June 17, 1965, he observed his wife kissing Glidden at her apartment door when he left after midnight, was corroborated by the testimony of investigators Davison and Fanflik. The observation of appellee's apartment by the appellant on the evening of the 12th and early morning of the 13th of June 1965, on which occasion the alleged paramour left at 4:30 a.m. was corroborated by investigator Davison.

Viewing all of this evidence and considering the source of it, we are of the opinion that the chancellor was clearly erroneous in dismissing the husband's cross-bill charging the wife with adultery.

Platonic relationships often exist but the Court does not think this was one of them. Nor do we believe that in finding that the chancellor clearly erred in dismissing the cross-bill, we are falling victims of the motto of the Order of the Garter, *"Honi soit qui mal y pense."* The sentiment of this Court is well expressed in *Hockman v. Hockman, supra,* when Judge Delaplaine, speaking for the Court, said at p. 347:

> "There is a possibility, of course, that Mrs. Hockman has not committed the offense with which she is charged, but the courts of equity cannot decide issues of this kind on mere possibilities, but must decide them in accordance with what would appear to be the fact from all the evidence in the guarded judgment of just and reasonable men of ordinary experience. *Swoyer v. Swoyer,* 157 Md. 18, 30, 145 A. 190; *Bowler v. Bowler,* 183 Md. 493, 501, 39 A. 2d 538."

We next address ourselves to the consideration of the find-

ing by the chancellor that the appellant was guilty of deserting the appellee as alleged in her supplemental bill of complaint. We concur with this finding. The absence of the appellant in the spring of 1963 from the Bradley Boulevard apartment; the manner and circumstances under which he attempted the unsuccessful reconciliation; his telegram to his wife, sent to her while she was visiting her mother in New Jersey in June of 1963, telling her to remove her belongings from the Bradley Boulevard apartment, support the allegation that he intended to terminate the marital status. The appellee's establishment of a separate abode in the Adelphi apartment and her support of herself and child from September of 1963 till the filing of the supplemental bill in June of 1965, and the obvious indifference of the appellant to his marital obligation of support, justify the conclusion reached by the chancellor in finding the appellant guilty of desertion.

However, we must hold that the chancellor erred in granting a decree of divorce *a vinculo matrimonii* in favor of the appellee against the appellant for the reason that the case at bar presents the matter of recrimination working to the disfavor of the adversaries. Both the husband and wife are guilty of marital offenses of equal magnitude which precludes either spouse from obtaining a divorce from the other. Each has proven the other party guilty of marital offenses which would have warranted a decree *a vinculo matrimonii* being granted in their favor, if it had not been for their own dereliction.

The issue of recrimination in the case at bar is controlled by *Courson v. Courson,* 208 Md. 171, 117 A. 2d 850 (1955), a case wherein Judge Hammond (now Chief Judge), writing the opinion for the Court, included a comprehensive analysis of the legal effect of recrimination in divorce proceedings in Maryland.

The stalemate which results from the application of the doctrine of recrimination is certainly distasteful to the courts, especially in those cases wherein the evidence leaves little doubt but that the marriage is beyond salvage, and yet both parties must be bound by the marriage contract. As was recognized by the Court twelve years ago in *Courson* at p. 178: "Whether the law of Maryland should be changed to recognize the doc-

trine of comparative rectitude, or the theory of the courts in the District of Columbia that recrimination should not be an absolute bar, or that recrimination should not be a bar at all, is for the Legislature, and not for this Court, to say, in view of the settled state of the law in this State."

The final decree entered in these proceedings under date of February 8, 1966, is reversed as to those orders in the decree, and those orders only, granting the appellee, Madeleine N. Matakieff, a divorce *a vinculo matrimonii* from the appellant, Apostol H. Matakieff, and awarding her alimony of $100 per month; in all other respects the decree is affirmed.

*Decree affirmed in part, reversed in part, appellant to pay the costs.*