## CARL CLIFFORD STENGER, SR. *v.* JUNE FRANCIS STENGER

[No. 322, September Term, 1971.]

*Decided February 1, 1972.*

The cause was argued before ANDERSON, THOMPSON and GILBERT, JJ.

*David M. Williams* and *Leonard J. Kerpelman* for appellant.

No appearance by counsel for appellee. *Walter D. Webster* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

The parties to this proceeding were married in May of 1944. Three children were born as a result of the marriage, two of whom are adults. They separated in January of 1969 and have continued to live separate and apart without cohabitation since that time. On August 20, 1970, Carl Stenger, the husband, filed a Bill of Complaint for Divorce a vinculo matrimonii or in the alternative, a divorce a mensa et thoro, custody of Gail Louise Stenger, the 16 year old daughter of the parties, and a determination of his rights pertaining to business property. Mrs. Stenger filed an answer admitting the formal parts of the Bill of Complaint but denying the grounds for divorce, his right to property relief and to the custody of Gail. The chancellor granted the husband relief as to his claims for certain property but denied him a divorce of either type and denied him custody of the minor child. The husband appealed; the wife did not.

On appeal, he alleges that the chancellor was correct in determining that his wife's conduct was such as to make her guilty of constructive desertion prior to her husband's adulteries but complains that the chancellor was clearly erroneous when he denied the divorce on the grounds of recrimination by reason of the husband's adulteries and in awarding counsel fees and support for the wife. He makes no claim contesting the custody of the child. The wife did not appeal and since we will affirm the finding of the chancellor that recrimination was established, there is no occasion for us to review the finding

of the chancellor with respect to the wife's constructive desertion.[1] We will recite further facts only in so far as they are germane to the questions before us.

The question of recrimination concerns solely the appellant's conduct with one Helen Russell although Mrs. Stenger gave generally uncorroborated testimony concerning other paramours.

According to Mrs. Stenger:

The first incident occurred on March 17, 1965. The wife, obviously suspicious, went to check on her husband who had told her that he was going to call on a customer. She located his car parked at an airport near Mrs. Russell's home and broadened her search to include the exterior of Mrs. Russell's kitchen window where she heard her husband's voice and saw him in the kitchen preparing a drink. She returned home and neither her husband nor Mrs. Russell were aware of her visit. She did not state the hour of this occurrence.

On June 15, 1965, Mr. Stenger took his wife and daughter to Great Oak for lunch. While they were having lunch, Mr. Stenger left his wife and daughter three times to call on Mrs. Russell, the dining room manager, in her office. After they returned home, Mr. Stenger explained he must return to Great Oak as he had left his briefcase in the manager's office. Mr. Stenger did not return home until 4:30 the next morning.

On March 9, 1966, Mr. Stenger went out for dinner with a Mr. Shannahan. The next morning, Mrs. Stenger found in her husband's pocket, a note in her husband's handwriting, saying, "Pick me up at Helen's at 10:30."

---

1. The opinion of the chancellor did not spell out the time the parties separated and his findings did not indicate whether he found that the husband would be, in the absence of recrimination, entitled to a divorce a vinculo matrimonii or a mensa et thoro. The evidence is undisputed, however, the parties separated in January of 1969 and that they did not cohabit thereafter. We will, therefore, consider the finding to mean that the constructive desertion by the wife continued for a period of 18 months when it ripened into grounds for an absolute divorce. There seems no question but that the separation was deliberate and final and beyond any reasonable expectation of reconciliation. Md. Code, Art. 16, § 24.

Along with the note she found a package of prophylactic "rubbers"; her husband told her he had no idea how they got in his pocket.

On May 21, 1966, Mrs. Stenger had quite an argument with her husband and accused him of "running with" Helen Russell. The husband stated that Helen Russell was "a wonderful woman" and someday he was going to have her money and her brains in his business. She testified that her husband continued to stay out late at night and refused to give her any explanation as to where he had been. On many of these nights she got into her car and looked for him sometimes accompanied by paid investigators.

On August 14, 1969, Mrs. Stenger and two of her investigators trailed Mr. Stenger and Mrs. Russell to a motel in New Castle, Delaware and kept the room under surveillance until noontime the next day when Mr. Stenger, clad only in undershorts, left the room, to get some clothes from his car. When she went to where her husband was living to discuss the matter with him, he pushed her out the door and refused to talk with her.

The next night, she and the investigators trailed Mr. Stenger to Great Oak; after he left his car at a restaurant and Mrs. Russell had picked him up in her car. While outside, Mrs. Stenger overheard conversation concerning the appellant's business affairs and saw the lights in the house extinguished except for a dim light. She saw the pair go into the bedroom and heard their "ecstasies" in bed. About 2:30 a.m. the investigators went to the door and tried to get Mr. Stenger to come to the door but he refused. When Mrs. Russell answered the door, she was in her nightgown and barefooted. She overheard Mr. Stenger suggest that Mrs. Russell call the sheriff and ask him to have the investigators arrested for disturbing the peace. The sheriff arrived but refused to go into the home over Mrs. Russell's objections until after Mrs. Stenger had sworn out a warrant for her husband for a prior assault and battery and Mrs. Russell had obtained

an arrest warrant for the investigators for disturbing the peace. Mrs. Stenger heard her husband pleading with the sheriff not to take him "out there" in front of his wife but the sheriff did take him to jail along with the two investigators. Some time thereafter Mrs. Stenger talked with Mrs. Russell requesting that she stop seeing her husband. Mrs. Russell said, "Well, I have been seeing him, but I am not seeing him now."

On October 4, 1970, Mrs. Stenger and the investigators once again trailed Mr. Stenger to Mrs. Russell's home, which since November 30, 1969 was a trailer in Felton, Delaware. Mrs. Stenger testified that as her husband drove past Mrs. Russell's home, he "tooted his horn" and continued 6 or 8 miles to Harrington, Delaware where he parked. She observed Mrs. Russell pick up Mr. Stenger in her car; the two then returned to Mrs. Russell's trailer arriving about 11:30 p.m. About 2:30 or 3 o'clock the following morning, Mrs. Stenger, her daughter-in-law, Pamela Stenger, and the investigators went to the manager of the trailer court; they then knocked on the trailer door and asked Mrs. Russell to come to the door. They requested Mr. Stenger to come out. Mrs. Russell answered the door clad in a "nightgown or mu-mu gown." Mrs. Stenger testified that she saw her husband's bare feet standing behind Mrs. Russell while she was denying he was present. She overheard her husband tell Mrs. Russell to "call the state police." Before the police arrived, Mrs. Stenger testified that, through a crack in the window curtain, she could see her husband pacing back and forth. The police arrived but refused to arrest anybody. Using her key, Mrs. Stenger drove Mr. Stenger's car back to her Maryland home.

Sheriff Bartis L. Vickers testified that at 2:30 on the morning of August 17, 1969, he was called to the residence of Helen Russell and that after a warrant for Mr. Stenger was obtained, he entered the home and found Mr. Stenger standing behind the door in a room in the home. At that time, Mr. Stenger was fully dressed. Al-

though there is a one day discrepancy in the date as given by Mrs. Stenger, it is obvious both witnesses were discussing the same incident.

Pamela Stenger, 23 year old daughter-in-law of the parties, generally corroborated the testimony of Mrs. Stenger as to the episode of October 4th. She had gone with Mrs. Stenger to Harrington, Delaware and then to Felton. When Mrs. Russell answered the knock on her door she wore a "mu-mu" and was barefooted. She later observed Mr. Stenger, through the opening in a curtain, at which time he was fully clothed. She was not questioned as to his attire at the time of the knock on the door. Later Mrs. Stenger drove Mr. Stenger's car home.

Frank C. Russell, operator of the Great Oak Resort and Yacht Club, Inc., testified that Helen Russell (to whom he was not related) was in his employ from 1965 or 1966 until November 30, 1969. Mrs. Russell coordinated the dining room activities and worked in various other departments. Mr. and Mrs. Stenger were "very good members of our club" and he observed them at the club on a great many occasions. He observed Mr. Stenger and Mrs. Russell together in the club bar, but "saw nothing wrong with their relationship at the club."

Mr. Russell did see something wrong when, after newspaper reports of the early morning incident involving the sheriff, friends of his family thought that his wife was seeing Mr. Stenger. "We were embarrassed and it was hard to convince some of the people in this town that my wife . . . was not Helen Russell."

About a year previously it had come to his attention that there was a "social relationship" between Mrs. Russell and a "married man," apparently meaning Mr. Stenger, and he told her that she should watch her conduct. When asked if his charge was based on rumor he said, "Well, there didn't seem to be much secret about it. She admitted it to me personally. She said it was all over with."

Jean Shaffer, a friend of the parties to these proceed-

ings, testified, that "probably in 1966" Mr. Stenger told her that he was dating another woman but not to tell Mrs. Stenger. On cross-examination she said she could not be sure whether he was serious or not as "we were always in a jovial mood."

Mr. Stenger testified that his visits with Mrs. Russell were either in her capacity as purchasing agent for Great Oak, or to discuss the problems of his wife's unfounded charges concerning his relationship with her. He denied being in her trailer at Felton, Delaware but stated he met her that night about 12:45 on the street in Harrington for about five minutes to discuss a problem about a truck driver who "was trying to get her fired." He then kept a late business appointment with a friend. After a trip with the friend to Dover, he found his car missing. He admitted being in Mrs. Russell's home on August 15 and 16, 1969, but claims he was present only to discuss the problems created by Mrs. Stenger's unfounded charges.

The paid investigators did not testify.

## I

Mr. Stenger claims on appeal the evidence was not sufficient to establish his recriminatory adultery. He argues the testimony of Mrs. Stenger was insufficient to show any adulterous disposition of himself and Mrs. Russell and in the alternative, there was insufficient corroboration of her testimony. We will discuss the question as to the sufficiency of Mrs. Stenger's testimony first and point to those portions of her testimony which, in our opinion, clearly indicate an adulterous disposition on the part of her husband and of his alleged paramour. On March 10, 1966, Mrs. Stenger found a note, which was produced in evidence, in her husband's handwriting saying, "Pick me up at Helen's at 10:30" together with a box of contraceptives for which the husband did not give any adequate explanation. In mid-August, 1969, she observed her husband and the paramour occupy overnight a room at a motel. Her husband refused to discuss this incident with her. The next night she observed her

husband and the alleged paramour enter the home of the paramour, go into the bedroom and heard their "ecstasies in bed." [2] Finally, on October 4, 1970, she observed the alleged paramour meet her husband in a public place and drive him to her home about 11:30 at night. After observing the premises for three to four hours, the investigators knocked on the door and Mrs. Russell appeared barefooted in a nightgown or mu-mu gown; she observed her husband standing behind her in his bare feet. This recounting of the testimony of Mrs. Stenger should adequately dispose of the argument that her testimony failed to show an adulterous disposition on the part of her husband as well as the paramour.

Appellant's most strenuous argument is that his wife's testimony as to the adulterous disposition of himself and the paramour were not corroborated as required by Md. Code, Art. 35, § 4. By its terms, this statute applied only "in suits, actions, bills or other proceedings instituted in consequence of adultery, or for the purpose of obtaining a divorce, . . . no verdict shall be permitted to be recovered, nor any judgment or decree be entered upon the testimony of the plaintiff alone; but in all such cases testimony and corroboration of other than the plaintiff shall be necessary; . . ." In the instant case, the appellee, Mrs. Stenger, sought no affirmative relief but raised the issue as to her husband's adultery solely to defeat his claim for divorce.[3] It is not at all clear that in such a situation the statute was intended to apply. The law seems clear, however, that when a charge involving moral

2. In her testimony, Mrs. Stenger used the word "ecstasies" in connection with another incident. On cross-examination she was asked about the other incident and said she used it to mean, "Oh, I'm glad to see you. Oh, it is so nice to see you. Things like that." She was not asked what she meant by "ecstasies in bed" on the occasion here referred to. The appellant's argument that this word indicated only innocent conduct ignores the fact that the second time she used the word, Mrs. Stenger was referring to an occurrence in a darkened bedroom.

3. Recrimination does not have to be specially pleaded. It could be considered by an appellate court even though the chancellor made no specific finding on the point. *Courson v. Courson*, 208 Md. 171, 175, 176, 117 A. 2d 850.

turpitude is imputed in a civil case, something more than preponderance of evidence must be produced so that the proof is clear and satisfactory. See *German v. German,* 137 Md. 424, 437, 112 A. 789. It could be argued that since a plaintiff who establishes an absolute ground for divorce can be denied relief on the basis of recrimination only if the recrimination also constitutes a ground for absolute divorce, *Courson v. Courson, supra,* the defense must be established as firmly as when alleged by a complaining party. In *Green v. Green,* 125 Md. 141, 93 A. 400, the Court of Appeals denied the husband a divorce in an uncontested case where his evidence was sufficient to justify an absolute divorce on the grounds of abandonment, but during the course of his testimony he had admitted having committed one act of adultery after the statutory period of desertion had elapsed. The Court, without discussion of the question of corroboration, denied the divorce on the basis of the admission. See also *Matakieff v. Matakieff,* 246 Md. 23, 226 A. 2d 887. For the purposes of our decision we will assume, without deciding, that corroboration is necessary to establish adultery as a recriminatory bar to an absolute divorce. We point out, however, that in a contested case, where collusion is unlikely, the corroboration need only be slight, *Garner v. Garner,* 257 Md. 723, 264 A. 2d 858; and that the standard of corroboration is not as strict as it was prior to the repeal of Maryland Rule S75, *Spencer v. Spencer,* 258 Md. 281, 265 A. 2d 755, and *Carpenter v. Carpenter,* 257 Md. 218, 262 A. 2d 564.

To support his arguments, appellant cites *Laccetti v. Laccetti,* 245 Md. 97, 225 A. 2d 266, wherein an alleged correspondent and his two children occupied the same dwelling as the wife and her two children. It was here explained that the arrangement was made to satisfy a Juvenile Court Judge that the man had someone to supervise his children so that he could retain custody of them. There was no evidence that the parties had in any way showed affection for each other or had ever, indeed, been in the same bedroom together. On these facts

the Court held that although there was opportunity for adultery there was no evidence showing an adulterous disposition. That case did not turn on a question of corroboration but rather the lack of any evidence whatsoever as to disposition to commit adultery. In *Lickle v. Lickle,* 188 Md. 403, 52 A. 2d 910, disposition was inferred from a long and constant companionship over an extended period of time. Appellant attempts to distinguish *Lickle* on the basis that in the instant case, the husband and his paramour were shown to be together only on two isolated occasions fourteen months apart. *Lickle* also does not involve corroboration but rather the absence of any evidence of adulterous disposition except that inferred from long association. In the instant case we cannot overlook the very positive testimony of the wife, which if corroborated, is sufficient to show the adulterous disposition of both her husband and the paramour.

Appellant also cites *Dougherty v. Dougherty,* 187 Md. 21, 48 A. 2d 451 and *Matakieff, supra,* as supporting his position that the corroborative evidence was insufficient to establish recrimination. We fail to see how these bear any special reference to the point here at issue.

Two other cases should be noted where the Court found the evidence sufficient to show a disposition to commit adultery on the part of the alleged guilty parties even though there was no display of affection shown in the record. In *Abare v. Abare,* 221 Md. 445, 157 A. 2d 427, such a disposition was inferred from abundant opportunity, i.e., frequent lengthy evening visits. See in the same vein *Pontorno v. Pontorno,* 257 Md. 576, 263 A. 2d 820.

In *Blankenship v. Blankenship,* 239 Md. 498, 212 A. 2d 294, only the husband was able to testify to a display of intimacy between the allegedly adulterous parties, but the Court found sufficient corroboration in the admissions of the alleged paramour that he was, on two occasions, present in the woman's home late at night. The Court said at pages 510-511:

"While acknowledging that in a number of cases, the evidence relative to the existence of an adulterous disposition had been 'some more or less public display of intimacy observed by others,' Chief Judge Brune for the Court stated that 'these facts [recited in *Abare*] seem to us sufficient to support an inference of a disposition on the part of both the husband and the correspondent to commit the offense charged, *as well as* to show ample opportunity to commit it' (p. 451, emphasis supplied). At another point, this Court said: 'The repeated visits of the correspondent to the husband's home show abundant opportunity, and we think the *circumstances of those visits* are sufficient to warrant an inference of a disposition to commit adultery' (ibid., emphasis added). Compare *Lickle v. Lickle, supra,* where we said that 'while opportunity to commit adultery is not in itself sufficient to justify a finding of its commission, in the absence of evidence of a disposition to commit it, such a disposition may be inferred from the conduct of the parties and the surrounding circumstances' (p. 408 of 188 Md.). Indeed, we noted in *Abare* that displays of affection, such as those observed in *Steinla v. Steinla,* 178 Md. 367, 13 A. 2d 534 (1940), may often be less probative of a disposition to commit adultery than the late-evening visits of the *Abare* case, referred to above. Finally, in *Lickle v. Lickle, supra,* in rejecting the appellant's claim that 'he cultivated merely a Platonic relationship' with Mrs. Boone, we noted (at p. 410) that several of appellant's answers to highly significant questions were 'uncertain' or 'evasive'; the same may well be said of several of the explanations of Mrs. Blankenship and Sheriff Jamieson which have been quoted near the beginning of this opinion. In view of his opportunity to see, hear,

and communicate with these witnesses, we cannot say that the chancellor clearly erred in believing that those explanations were 'naive,' or were such as would appeal only to a naive and credulous mind."

Mr. Stenger argues that the chancellor's reliance on Mr. Frank Russell's testimony to show an adulterous disposition was misplaced. While we agree that Mr. Russell's testimony was ambiguous, the chancellor's opinion indicates that he drew his conclusions from the entire testimony rather than solely from that particular witness.

". . . It is true that the trier of the facts must consider what a reasonable person would believe from the testimony concerning the circumstances under which Mr. Stenger was found in the company or at the home of Mrs. Russell.

"Mr. Frank Russell in testifying, as I recall it—I am sorry I don't have the testimony here —said that Mrs. Helen Russell admitted to him that she had had an affair with Mr. Stenger, but that it was over. Regardless how you characterize that, whether it is a social affair or any kind of business affair or whatever the connotation of having an affair between two persons who were adults who are married or have been married is one that would include to the reasonable person having sexual relations.

"If all of the circumstances in this case were as Mr. Stenger has recited them to be there would certainly be an unusual concentration of coincidences which the Court cannot believe."

. . .

We cannot say that the chancellor who heard the witnesses was clearly erroneous when he found from all the facts an opportunity and a disposition on the part of Mr. Stenger and Mrs. Russell to commit adultery. It is, of course, elementary under the authorities herein cited that

opportunity and disposition to commit adultery are all that is required to prove adultery. The appellant's argument to us that the failure of Mrs. Stenger to produce the investigators at trial creates an inference that their testimony would be unfavorable to her cause is misplaced. Under the clear import of *Hoverter v. Director of Patuxent Institution*, 231 Md. 608, 188 A. 2d 696, which appellant cites, this was a matter for the chancellor and not us to weigh.

## II

The appellant also contends that because the court in the instant case found the wife had deserted her husband, under *Kerner v. Eastern Hospital*, 210 Md. 375, 123 A. 2d 333, the chancellor improperly awarded counsel fees and alimony. *Kerner* is not a divorce case and has no application here. If a wife is without funds the law is clear she is entitled to counsel fees in a divorce action regardless of the outcome of the case. See *Egress v. Egress*, 202 Md. 510, 514, 97 A. 2d 335. The law is equally clear a wife in need of support is entitled to alimony *pendente lite* until a divorce case is finally disposed of regardless of the outcome of the litigation. *Dougherty v. Dougherty*, 189 Md. 316, 55 A. 2d 787. A wife who is guilty of desertion sufficient to sustain an action for absolute divorce is not entitled, however, to permanent alimony. See *Blumenthal v. Blumenthal*, 258 Md. 534, 266 A. 2d 337, 340. The alimony awarded in the instant case will, therefore, cease when the mandate from this Court is filed in the trial court. The final decree does not mention whether the alimony is *pendente lite* or permanent although it does make reference to a prior *pendente lite* order. To avoid any misunderstanding, we will affirm the decree except as to the award of permanent alimony. There is no contention concerning the amount of the counsel fee or the alimony.

> *Decree affirmed, except as to the award of permanent alimony which is reversed.*
> *Appellant to pay the costs.*