## HELEN ADAMS SAMI *v.* MOHAMMAD SAMI

[Nos. 918, 1006 and 1099, September Term, 1974.]

*Decided December 1, 1975.*

The cause was argued before POWERS, LOWE and MASON, JJ.

*Jackson Brodsky* for appellant.

*Allen J. Kruger* for appellee.

POWERS, J., delivered the opinion of the Court.

We deal here with three separate appeals, consolidated in this Court for briefs and argument, all arising from decrees or orders entered in a single equity case in the Circuit Court for Montgomery County. The case there was initiated by Helen Adams Sami, the appellant here, against her husband, Mohammad Sami, the appellee.

The contentions on appeal involve principally the divorce and child custody granted to Mr. Sami on his counter complaint, but relate as well to other orders entered before and after the decree.

A review of the voluminous record in this case reveals an almost incredible history of marital warfare, with skirmishes occurring up and down the eastern seaboard of

this country, as well as abroad. The parties have engaged in litigation in the courts of Maryland and Florida. A comprehensive recital of facts is not necessary, but we shall refer to such of the facts as are relevant to the conclusions we reach on the issues we find it necessary to decide.

Mr. Sami, a citizen of Afghanistan, was employed by an international organization. The parties were married in Philadelphia in 1965, and lived, with their two children, in Montgomery County. A complaint for divorce and other relief, filed by Mr. Sami in September 1973, was dropped by agreement in November, with a recital that the parties had become reconciled.

In early December 1973 Mr. Sami told his wife that he wished to take the children to New York for a few days for Christmas shopping. About a week later Mrs. Sami learned that her husband had departed from New York with the children, headed for Afghanistan. She and her brother intercepted the party at Beirut, Lebanon. The children were taken to Florida, and it appears from the record that they have lived there with their mother ever since that time.

The present case began with a bill of complaint filed by Mrs. Sami in the Circuit Court for Montgomery County on 4 January 1974. She prayed for a limited divorce, custody of the children, child support, alimony, and counsel fees and costs. By an amendment, she alleged that there were disputes over the ownership of personal property, and prayed that the court make a proper disposition of the personal property. Mr. Sami countered with a complaint asking for a divorce, custody of the children, and other relief.

Among the numerous pleadings, amended pleadings, motions, petitions, orders, and other preliminaries to trial was an assertion by Mrs. Sami of a decree of a Florida court granting custody of the children to her. Also in the record is an order finding Mrs. Sami in contempt of the Circuit Court for Montgomery County for failing to obey an order that she have the children present in that court for a hearing on custody pendente lite.

Before the trial on the merits began, on 24 September

1974, Mrs. Sami withdrew, with leave of court, all of her prayers except those relating to child custody, and for general relief. The entire record of the Florida custody proceeding, which we shall describe in more detail later, was received in evidence. In his subsequent opinion the chancellor referred to the issue thus raised, as follows:

"It developed at the hearing that Mr. Sami had instituted habeas corpus proceedings in Florida in an effort to enforce this Court's pendente lite order of February 8, 1974, awarding him custody of the children. He was unsuccessful. however, and the children's custody under the order of the Circuit Court for Broward County, Florida, remains in Mrs. Sami.

"Plaintiff argued that this settled the question of custody and that this Court in effect had no jurisdiction to rule thereon but we disagreed. It was pointed out that Mrs. Sami had invoked the jurisdiction of this Court by filing her Bill of Complaint for divorce and child custody. The fact that she thereafter removed herself and the children to Florida did not divest this Court of jurisdiction to determine the issue of child custody. Article 16, Section 66 (f)."

Mr. Sami testified at the trial, and offered evidence through numerous other witnesses. We need say only that the evidence abundantly supported the chancellor's findings that Mrs. Sami had committed adultery, and, with one exception which we shall discuss later, that the best interest and welfare of the children would be served by having their custody placed with their father.

At the close of the testimony counsel for Mrs. Sami represented to the court that a witness who had worked as a maid for Mr. Sami, and had lived in the home, was available to give testimony which would show that on several occasions in 1974 Mr. Sami had committed adultery. At the request of counsel the chancellor called the witness, Flor Easterlin, as the court's witness. She was examined

preliminarily by the chancellor, and was cross examined by counsel for each of the parties.

In his memorandum the chancellor referred to some of the testimony of Mrs. Easterlin. With respect to its place in the case, and its effect upon his conclusions, the chancellor said:

> "The plaintiff did not plead recrimination. The Court consented to hear the testimony of Mrs. Easterlin pursuant to Rule 521 on the ground there is manifest duty to deny a divorce where it appears to the Court, the plaintiff or moving party is guilty of a recriminatory offense. *Abare v. Abare,* 221 Md. 445.
>
> "It has often been said that where adultery is charged the evidence must establish affirmatively that the offense was committed. It has also been said that when a charge involving moral turpitude is imputed in a civil case something more than preponderance of evidence must be produced so that the proof is clear and satisfactory. *Stenger v. Stenger,* 14 Md. App. 232; *German v. German,* 137 Md. 424. It has also been noted that the defense of recrimination must be established as firmly as when alleged by a complaining party. *Stenger v. Stenger, supra,* at page 240. The Court stated also in the *Stenger* case at page 240:
>
>> 'For the purposes of our decision we will assume, without deciding, that corroboration is necessary to establish adultery as a recriminatory bar to an absolute divorce.'
>
> "On the sketchy and uncorroborated testimony of Mrs. Easterlin, we cannot say that adultery has been established as a recriminatory bar to Mr. Sami's prayer for an absolute divorce. Consequently, we will award an *a vinculo* divorce to Mr. Sami on the ground of his wife's proven adultery."

## The Defense of Recrimination in Divorce Cases

The doctrine of recrimination is well established in the law governing divorce in Maryland. An incisive discussion of the doctrine as construed and applied in this jurisdiction is reported in *Courson v. Courson*, 208 Md. 171, 117 A. 2d 850 (1955). There, at 174, the Court of Appeals said:

> "Recrimination is generally defined as a rule or doctrine which precludes one spouse from obtaining a divorce from the other, where the spouse seeking a divorce has himself or herself been guilty of conduct which would entitle the opposite spouse to a divorce. If both spouses were guilty of uncondoned adultery, the ecclesiastical courts, following the Mosaic law, would not grant relief by way of divorce to either of them. Almost all of the states follow this view and some, indeed most, go further."

At 175, the Court noted that the provisions and policies of the law as announced in its own cases forbid divorce "to either of two spouses, both of whom have committed acts which constitute grounds for divorce under the statute, even though the acts are different ...." The Court further observed:

> "In this State, too, recrimination need not be specially pleaded nor relied on, but if it appears to the chancellor that the complainant is guilty of recrimination, it is not only his right but his duty to refuse the divorce."

Over a decade after its decision in *Courson*, the Court of Appeals again reviewed the viability of the doctrine of recrimination in this State, and found it to be alive and well. In *Matakieff v. Matakieff*, 246 Md. 23, 226 A. 2d 887 (1967), the wife sued for divorce alleging desertion by the husband. He in turn filed a cross bill charging the wife with adultery. The chancellor granted the wife a divorce *a vinculo*. The Court of Appeals reversed.

The Court concluded that the evidence justified the chancellor's finding the husband guilty of desertion. But the Court found itself constrained by the doctrine of recrimination from affirming the decree. At 35, the Court said:

> "However, we must hold that the chancellor erred in granting a decree of divorce *a vinculo matrimonii* in favor of the appellee against the appellant for the reason that the case at bar presents the matter of recrimination working to the disfavor of the adversaries. Both the husband and wife are guilty of marital offenses of equal magnitude which precludes either spouse from obtaining a divorce from the other. Each has proven the other party guilty of marital offenses which would have warranted a decree *a vinculo matrimonii* being granted in their favor, if it had not been for their own dereliction.
>
> "The issue of recrimination in the case at bar is controlled by *Courson v. Courson*, 208 Md. 171, 117 A. 2d 850 (1955), a case wherein Judge Hammond (now Chief Judge), writing the opinion for the Court, included a comprehensive analysis of the legal effect of recrimination in divorce proceedings in Maryland."

More recently the continued applicability of the doctrine of recrimination in culpatory divorce cases was affirmed by this Court. In *Zell v. Zell*, 12 Md. App. 563, 280 A. 2d 22 (1971), the husband filed for divorce on the ground of voluntary separation, Art. 16, § 24, then amended his bill to include an allegation of the wife's adultery. The chancellor granted the husband a divorce *a vinculo* and the wife appealed. She argued that the decree was barred by proof of the husband's adultery. At 566, this Court said:

> "It is entirely possible, as argued by appellant, that the Chancellor did base his decree upon the wife's adultery and if there were no other evidence in the case than the wife's adultery as a ground for divorce, we would be compelled to set aside the

decree under the doctrine of recrimination because of the proof of the husband's adultery, technical or otherwise. See *Nelson, Divorce and Annulments* (2d ed.) Sec. 5.02. The doctrine of recrimination is still alive in this State and under it either spouse is precluded from obtaining a divorce from the other where each is guilty of a culpatory marital offense which would entitle the other to a divorce *a vinculo matrimonii*. See *Matakieff v. Matakieff,* 246 Md. 23, 35; *Courson v. Courson,* 208 Md. 171."

But we went on to observe that recrimination is not available as a defense to a suit based on the statute permitting divorce founded on voluntary separation. See also *Flanagan v. Flanagan,* 14 Md. App. 648, 655, 288 A. 2d 225 (1972).

Nor is the defense of recrimination based on the commission of adultery by the party seeking the divorce any less effective because his adultery occurred later. The Court of Appeals said in *Dougherty v. Dougherty,* 187 Md. 21, 48 A. 2d 451 (1946), at 31:

> "The law is established that a husband who has committed adultery is absolutely barred from a divorce on the ground of adultery or any other matrimonial offense committed by his wife, even though he may have committed the adultery after he left his wife on discovering her offense."

The nature of evidence required to prove adultery in divorce cases was discussed at length in *Dougherty v. Dougherty, supra,* where the Court of Appeals said, at 27-28:

> "It is an established rule that the burden of proof in a suit for divorce is upon the complainant, and where adultery is charged the evidence must establish affirmatively that the alleged offense was committed. It is not necessary, however, to establish the charge of adultery by direct evidence of the commission of the act, for because of the clandestine nature of the offense it is rarely possible to obtain evidence of the commission of the

act by the testimony of eyewitnesses. The offense may be inferred from the circumstances if the inference is the only natural and logical deduction to be drawn therefrom. To prove adultery, the circumstantial evidence must clearly establish (1) a disposition on the part of the defendant and the paramour to commit adultery, and (2) an opportunity to commit the offense."

More recently, and perhaps more succinctly, the Court said, in *Breault v. Breault,* 250 Md. 173, 242 A. 2d 116 (1968), at 178:

"It is the established law of this state that where divorce is sought on the ground of adultery that the adultery may be shown by circumstantial evidence and that an actual act of adultery need not be witnessed. [Citations omitted.] However, to establish adultery the circumstantial evidence must clearly establish (1) a disposition on the part of the defendant and the paramour to commit adultery, and (2) an opportunity to commit the offense. [Citations omitted.]"

Whether asserted as a defense or as a ground for relief, when adultery is the issue in a civil case the elements to be proved and the standards of proof are the same. *Abare v. Abare,* 221 Md. 445, 157 A. 2d 427 (1960); *Burger v. Burger,* 204 Md. 495, 104 A. 2d 923 (1954); *Dougherty v. Dougherty, supra.*

The present rule relating to corroboration in divorce cases is found in Code, Courts Art., § 10-901. It applies only to the testimony of the plaintiff (or the counter plaintiff). Testimony of a defendant or of any non-party stands the same in divorce cases as in any other case.

The chancellor characterized the testimony of Mrs. Easterlin as "sketchy and uncorroborated". He cited and quoted from *Stenger v. Stenger,* 14 Md. App. 232, 286 A. 2d 552 (1972) where we said, at 240:

"For the purposes of our decision we will assume, without deciding, that corroboration is necessary to

establish adultery as a recriminatory bar to an absolute divorce."

Although adultery was not the question involved, we said in *Binder v. Binder*, 16 Md. App. 404, 297 A. 2d 293 (1972), at 410:

"We should point out that a party who asserts an affirmative defense, but does not become a cross plaintiff seeking affirmative relief, is not subject to the statute requiring corroboration."

To the extent that he construed the law as requiring corroboration of Mrs. Easterlin's testimony, we hold that the chancellor erred. To the extent that he rejected her testimony because he considered it sketchy or otherwise insufficient, we hold that he was clearly erroneous. We note too that there was no intimation in the opinion that the testimony was untruthful or biased.

Mrs. Easterlin, a 47 year old housekeeper, was a native of Chile, and had worked for some years for her embassy. If her testimony was sometimes less than clear, the reason may well have been her limited capacity to express herself in the English language. If her testimony exhibited any bias, it was in favor of Mr. Sami. She worked for Mr. Sami for a month in the Fall of 1973, when the children were there, and for four months, April to July, in 1974, when the children were not there.

Under questioning by the court Mrs. Easterlin related numerous occasions when Mr. Sami had a guest or guests in the house. Many of them appeared to be perfectly proper social occasions. For example:

"Q What can you remember about any dates when he brought home ladies for dinner or a lady for dinner?

* * *

"A Yes. He brought some lady called Ann. I call her Ann from French because she is from French.

* * *

172

"Q What happened, what did you observe happening between Mr. Sami and the French lady named Ann?

"A They eat dinner and do some drinking and until I finish the dinner, I finish my job, they went to the living room to talk. I left to my room. I don't know what happened.

\* \* \*

"Q This lady came more than once?

"A Yes, three or four times. One time she played tennis with him and she took shower in his room.

"Q She took a shower?

"A Yes, in his room.

"Q Well was he in the room when she took the shower?

"A No, sir. He was in the garden."

She described a young lady named Judy, and her visits to the house. The transcript then reads:

"Q Now were there any other ladies who came to his house?

"A I saw the one lady there. Mr. Sami called me and said, 'Flor, do not cook nothing for me. Don't worry for my dinner because I will come in later.' Next morning he say, 'Good morning, Flor.' 'Good morning, Mr. Sami.' He say, 'Make a breakfast for two because I have a friend.' I surprised. The first time somebody sleep there. I believe some lady, very tall lady, blond hair, very corpulent. She is very embarrassed when I am too embarrassed because this is the first time I see Mr. Sami sleeping with lady there. She drink her coffee and he drink coffee too and they left. He did not talk nothing about her. He did not mention.

"Q Were you introduced to her?

"A Yes.

"Q What is her name?

"A I do not remember, sir. I am very embarrassed. The lady was too.

"Q Well you said she slept there. Where did she sleep, if you know, in what room?

"A I suppose in his room because Sophia —

"MR. KUDER: I object to her supposing.

BY THE COURT:

"Q Did you see where she slept?

"A Only the bed of Mr. Sami was messed. I made the bed. The room — everything was also straightened and I cleaned the children's room. Nobody sleep there. Then in the bathroom that Mr. Sami use there was only one towel to dry his body. That day there were two. There were two bed pillows, two pillows in the bed. I have experience. His bed sleep two persons. Two persons sleep in his bed.

"Q You say one bed was used and the other was not?

"A He only use one bed.

"Q Just one bed had been slept in?

"A Yes, sir, because the children's rooms were closed. He does not want to open the door because he upset."

After the witness told how a not-so-young but pretty Chilean lady was there for dinner, the questions and answers continued:

"Q Now were there any other ladies?

"A Yes. The lady, the last lady came, Ann. She came from Scotland.

"Q She is Ann from Scotland?

"A She is from Scotland. She is young lady too.

"Q Maybe in her twenties?

"A No, more than twenties, twenty-five or twenty-seven.

"Q Did you see anything happen between Mr. Sami and Ann of Scotland?

"A Yes. I saw her more. They don't have more discretion. She is more lonely than him.

"Q What happened? What did he do and what did she do?

"A She came and helped me cook. She helped me out. Mr. Sami invited his neighbor for dinner. Some time Mr. Sami had dinner alone with her. They had one cup of coffee took to his room and shut the door. I don't know what happened. I leave to go to my room too.

"Q Who went into his room?

"A Mr. Sami.

"Q Just Mr. Sami?

"A Mr. Sami with Ann from Scotland.

"Q You saw the two of them go into his room?

"A Yes.

"Q What time of night?

"A After dinner.

"Q 9:30?

"A I saw that two or more times."

\* \* \*

"Q And you saw them going to — what room was it?

"A Into his room.

"Q What kind of a room is that?

"A His room.

"Q Is it a study or bedroom?

"A It is a bedroom.

"Q Did he see you? Were you present when they walked into the room?

"A Yes, I am in the kitchen and he told me, 'Good night,' and I left. He went to his room with Ann.

"Q  You do not know what happened after that?

"A  No, sir. I never don't want to see nothing."

Cross-examination of the witness by counsel for each of the parties added little, and did not detract from the facts as we have recited them.

We note here that the chancellor apparently misread the testimony, and commented that Mr. Siland, a friend and fellow worker of Mr. Sami, lived in the house from March 21st, except for 10 or 12 days he was away on a trip. The testimony was that he came on June 21st, and was there during Mrs. Easterlin's last month, except for his trip abroad.

The evidence we have quoted is much more than a mere showing of disposition and opportunity, which is universally accepted as sufficient circumstantial evidence that adultery was committed. Here there was direct proof of facts which permit no other conclusion but that on several occasions a woman shared Mr. Sami's bed with him for the night. We consider it highly significant that Mr. Sami, who was present in court and heard this damning testimony against him, neither denied it nor attempted to explain it. In *Chalkley v. Chalkley*, 236 Md. 329, 203 A. 2d 877 (1964), the Court of Appeals said, at 333:

"When a party to a case refuses to take the stand and testify to the facts peculiarly within her knowledge, this Court is warranted in drawing an inference that the testimony would be unfavorable."

That part of the decree which granted a divorce to Mr. Sami must be reversed.

### Full Faith And Credit
### In A Child Custody Case

Two or more states may have, at the same time, jurisdiction to grant, deny, or change the custody of the same children. *Schwartz v. Schwartz*, 26 Md. App. 427, 338

A. 2d 386 (1975); *Seidlitz v. Seidlitz,* 23 Md. App. 327, 327 A. 2d 779 (1974). The jurisdiction of each state is determined by its own laws, subject to the Constitution and laws of the United States, and is no less effective because it is not exclusive. For example, Maryland's jurisdiction under Code, Art. 16, § 66 (f), apparently applicable here, may be exercised regardless of where the children may be, and is limited only by the full faith and credit clause of the U.S. Constitution.

The Florida proceeding began with a petition filed by Mrs. Sami on 5 February 1974 for alimony without dissolution of marriage, and custody of children. An ex parte order granting her temporary custody was entered on the same day, some three days before the ex parte order in Maryland giving Mr. Sami pendente lite custody.

Mr. Sami entered the Florida case with a habeas corpus proceeding, asserting the order of the Maryland court, and challenging the jurisdiction of the Florida court. At a hearing held there on 15 March 1974 the Florida court ruled that it would conduct a full hearing on the merits. Further hearings were held on four more days during April and May, the last on 29 May. Both parties were before the court personally and with counsel, and each testified, and presented several other witnesses. On 5 June 1974 the Florida court entered an order denying Mr. Sami's petition for a writ of habeas corpus, and granted temporary custody of the children to Mrs. Sami. Mr. Sami appealed that order. The record does not show the disposition of his appeal.

In a case with many factual parallels to the case now before us, *Rethorst v. Rethorst,* 214 Md. 1, 133 A. 2d 101 (1957), the Court of Appeals held than an award of custody by a California court was entitled to full faith and credit in Maryland where: both parents and the children were within the territorial jurisdiction of the California court; the Maryland court had made no final adjudication of custody but had merely entered an ex parte interlocutory order; and the party contesting the award appeared personally and participated fully in the California proceedings.

In its opinion the Court said, at 12-13:

"In actual result the decree of the Circuit Court denied full faith and credit to the California decree on the subject of custody, apparently on the ground that Maryland, and not California, had jurisdiction over the children. This view of the law, if supported by the facts, is in accord with the rule set forth in the *Restatement, Conflict of Laws*, § 32, which was recognized and substantially quoted in *Ross v. Pick*, 199 Md. 341, 348, 86 A. 2d 463, in which this Court said: 'It is true that a minor child's domicil, in the case of divorce of its parents, is that of the parent to whose custody it has been legally given; *and if there has been no legal fixing of custody, its domicil is that of the parent with whom it lives*; but if it lives with neither, it retains the father's domicil.' (Italics supplied.) We believe that this rule of the *Restatement* represents the generally accepted view on this subject. *Beale, Conflict of Laws*, Vol. 1, § 32.1, points out that under the older law, if the parents were living apart against the will of the father, but were not divorced, and the child was with the mother, the child's domicil continued to be that of the father. He goes on to say that under 'the correct modern view', if the parents are living apart because of the father's fault, a child living with the mother takes her domicil.

"The California court took the view that both it and the Maryland court had jurisdiction to make a custody order, and that the order of whichever court might first enter a final order in an adversary proceeding would be controlling. It does not seem to have considered the rule stated in § 32 of the *Restatement of Conflict*, but proceeded to award the custody of these children as it deemed proper. Reprehensible as Mr. Rethorst's conduct in taking the children from the mother by what amounts to trickery may have been, all of the facts on that

matter could have been presented (and, we believe, were presented) to the California court. The parents and the children were all within its territorial jurisdiction, no final adjudication of the rights of custody had been had in Maryland (only an ex parte, interlocutory order had been signed), and Mrs. Rethorst appeared personally in the California suit and participated fully in those proceedings. Any questions based upon domicil could have been presented. No matter how much we may deplore a determination which has the effect of rewarding the husband's trickery, the judgment of the California court concludes the question of custody and is entitled to full faith and credit here, and is not subject to collateral attack. As is said in the *Restatement, Conflict of Laws,* Chapter 5, Section 147, Comment a, pp. 212-213: 'An award of custody, like any other judgment or decree of a competent court, is entitled to recognition and enforcement in other states. * * * It is, therefore, conclusive of the status of the child at the time the decree was rendered and the merits of such an award cannot be re-examined either in the state where rendered or in another state."

In another somewhat parallel case, *Schwartz v. Schwartz, supra,* we applied the same principle. We said, at 431-32:

"By participating in the Florida custody hearing, Mrs. Schwartz had a full opportunity to contest the jurisdiction of the Florida court. If she raised that issue and disagreed with the chancellor's decision, her remedy was to appeal, a remedy which she did not pursue. It matters not whether she actually litigated the jurisdictional issue there, only that she had the opportunity to do so.

* * *

"Having had her 'day in court' on the jurisdictional

issue, Mrs. Schwartz is barred by res judicata from now collaterally attacking the Florida judgment. *Rethorst,* 214 Md. at 13. The Florida decree is entitled to full faith and credit."

Under the law which we must apply, we may not even consider whether the Maryland order or the Florida order may be right or may be wrong on the question of custody of the Sami children. The question has been decided by a Florida court in an order to which the courts of Maryland must extend full faith and credit. If the Florida decision is erroneous, it is subject to review on direct appeal from the Florida judgment through the Florida courts, and, if necessary, to the Supreme Court of the United States. *Johnson v. Johnson,* 199 Md. 329, 336, 86 A. 2d 520 (1952).

There is no contention here that the custody decree appealed from was made upon a finding of a change in circumstances after the Florida order of 5 June 1974.

The order dealing with custody of the children of the parties must be reversed.

### The Contempt of Court Order

A hearing was scheduled for 7 February 1974 on a show cause order relating to custody pendente lite. By orders of 21 January and 25 January the court directed Mrs. Sami to have the children present in court for that hearing. She did not attend the hearing, nor were the children present. The docket shows an entry on 7 February: "Defendant's oral motion to find Plaintiff in Contempt * * * ." The transcript records that after the hearing was concluded the court said:

> "The court finds that the plaintiff, Helen Adams Sami, is in willful and direct contempt of a lawful order of this Court; namely, our orders of January 21 and January 25, 1974.
>
> "And in compliance with the rules of the Court pertaining to contempt we are directing the Clerk file in this proceeding an order of the Court which

states the reasons for our holding the plaintiff, Helen Adams Sami in contempt."

On that same date a written order was filed. After appropriate recitals the order "ADJUDGED, that the defendant, Helen Adams Sami, is in direct contempt of this Court * * * ."

The record on the contempt aspect of this case is too bare to permit an extensive consideration. Under Subtitle P of the Maryland Rules, and under *State v. Roll and Scholl,* 267 Md. 714, 298 A. 2d 867 (1973) and the other authorities, it seems clear that if there was a contempt it was a civil contempt, at least in its inception, and that under Rule P1 it was constructive, not direct. And indeed, no punishment has been imposed.

We hold that the question of contempt in this case is still at the starting gate, and that there cannot be a valid adjudication that Mrs. Sami is in contempt until there has been full compliance with all procedures required by the circumstances.

### Sequestration Orders and Injunctions

The appeal in No. 1006 was taken from ex parte orders which appear to have been superseded by later orders from which the appeal in No. 1099 was taken. The appeal in No. 1006 will be dismissed as moot.

Two post trial orders signed on 27 January 1975 are the subject of the appeal in No. 1099. One recited the failure of Mrs. Sami to transfer physical custody of the children in accordance with the order of 29 October 1974, and asserting the court's authority to sequester real or personal property of a party to compel compliance with the court's decrees, ordered that Mrs. Sami's interest in two parcels of real estate in Maryland be sequestered.

The companion order enjoined Mrs. Sami from removing any personal property from either of the two parcels of real estate.

With our decision in No. 918 the reason for the orders does not exist, and they will be reversed.

> *In Appeal No. 918, those parts of the decree of 29 October 1974 which award a divorce to Mohammad Sami and award him custody of the two minor children of the parties are reversed.*
>
> *The adjudication of 7 February 1974 that Helen Adams Sami was in direct contempt of the court is vacated.*
>
> *Appeal No. 1006 is dismissed.*
>
> *In Appeal No. 1099 the orders dated 27 January 1975 are vacated.*
>
> *Appellee to pay costs.*