## LAURA K. RENNER *v.* WILLIAM F. RENNER

[No. 521, September Term, 1971.]

## WILLIAM F. RENNER *v.* LAURA K. RENNER

[No. 715, September Term, 1971.]

*Decided September 11, 1972.*

The cause was argued before ORTH, THOMPSON and POWERS, JJ.

*Z. Townsend Parks, Jr.*, with whom were *Parks, Parks & Schneider* on the brief, for appellant and cross-appellee.

*Robert R. Bair*, with whom were *L. Dale Burgmeier* and *Venable, Baetjer & Howard* on the brief, for appellee and cross-appellant.

THOMPSON, J., delivered the opinion of the Court.

## APPEAL NO. 521

This opinion involves appeals in two separate cases of divorce and related matters which were consolidated for the purposes of argument on appeal. We will discuss the two cases separately. In the first case Dr. William F. Renner filed suit against his wife, Laura K. Renner, for divorce *a vinculo matrimonii* on the ground of eighteen months constructive desertion and Mrs. Renner filed a counter suit for a divorce *a vinculo matrimonii* and alimony on the grounds of adultery and desertion.[1] The chancellor found that Dr. Renner had established constructive desertion for a period of eighteen months by Mrs. Renner but denied him a divorce by reason of his adultery; he denied Mrs. Renner alimony because of her constructive desertion. Mrs. Renner, contending that she was not guilty of constructive desertion, appeals from the final decree insofar as it denied her alimony. Dr. Renner appeals from an order awarding Mrs. Renner's attorney a counsel fee of $4,000.

## FACTS

The nature of the case will appear from some extracts

---

*Note: *Certiorari* denied, Court of Appeals of Maryland, November 28, 1972.

1. The proceedings below were more complex than indicated but for the purposes of this opinion there is no need for us to detail the various pleadings, etc.

from Chancellor William H. McCullough's oral opinion; his findings are adequately supported by evidence:

"Now, Mrs. Renner filing her bill of complaint based on the allegation of adultery has, in the Court's view, proved adultery on Dr. Renner's part. The testimony of both the detective and Mrs. Renner, the son, Ned, and I think a neighbor, but I have forgotten the name of the neighbor, who went on several occasions with Mrs. Renner to the abode where Miss Parrish was living, proved time, place, inclination and opportunity to commit adultery. The Court finds as a fact the doctor did, in fact, commit adultery with Miss Parrish in March of 1968 and through the spring of that year. So on the basis of that complaint Mrs. Renner would be entitled to alimony and custody.

"But then we come to Dr. Renner's complaint on constructive desertion. * * *

"Dr. Renner . . . called Mrs. O'Neill who worked in [his] office from 1959 to 1963. She testified that Mrs. Renner would call the office constantly, tie up the phone, that her language was so bad that she did not want to repeat it in court, that she accused Dr. Renner with having an affair with Mrs. Blackburn. She said that she would call sometimes as much as fifteen times a day and that this would happen in spurts. She further testified that Dr. Renner became so unnerved that he had to sleep in his office on the examining table in order to get enough rest to be able to carry out his duties as a physician and meet his obligations to his patients and to the hospital. She said she never met Mrs. Renner but that she had talked to her on the phone many times.

"Mrs. Blackburn then testified that in 1958 she was working with Dr. Renner or rather in Dr. Renner's office, that [Mrs. Renner] accused Mrs. Blackburn of fooling around with her husband, that she would call the office five, six times, sometimes fifteen times a day and that these calls lasted until the fall of 1966 when Mrs. Blackburn said she refused to talk to Mrs. Renner any more. * * * She testified that Dr. Renner's conduct was

always that of a gentleman, that all the other doctors liked him, his patients liked him and respected him. Since Dr. Renner has since ceased living with his wife the calls have ceased coming to the office.

"Miss Pierelli next testified that she was working for Dr. Renner in 1949, 1951, that Mrs. Renner would call often. She accused her of having an affair with Dr. Renner. She got so unnerved that she would have to switch the calls to Dr. Renner even though he was attending to a patient. She finally got to a point that she talked the situation over with the doctor and agreed that the best interest of the office would be that she leave her employment, even though the doctors, both of them, thought she was an excellent employee. Mrs. Renner also told patients that when Dr. Renner could not be reached that he was at Miss Pierelli's home. Mrs. Renner also threatened Miss Pierelli. She said also that after she left Mrs. Renner threatened that she would get her.

* * *

"John Renner said he could not bring people home into the house because of his mother. He avoided the house. He really did not get along very well with his mother. He brought Linda home, who he eventually married, and as a result of some conversation with his mother that his mother called Linda a prostitute. This completely destroyed whatever love John might have had then for his mother. I think that ended it and John moved out of the house in June of 1966. Dr. Renner had previously warned Mrs. Renner that if she kept up the conduct she was keeping and if John left the house he would leave also, and he was not going to permit her to drive his son from the house.

* * *

"Dr. Freeman testified that he knew Miss Pierelli and knew the good Dr. Renner. There was never anything between the two of them, that Miss Pierelli got so upset because of the calls from Mrs. Renner and the accusations made by Mrs. Renner, that everyone agreed it would be to the best interest of Miss Pierelli and to the office staff if she left the employment, which she did.

"Dr. Renner then testified as to his eloping with his wife. He agreed that she helped put him through college. He testified that the relationship early in the married life had become a very stormy relationship, that his wife was a high-strung, impulsive woman who could not hold her temper. He testified that as early as 1954 she dumped his medical books on the sidewalk, dumped out his file cabinet. She refused to attend social functions. When patients would call the home, even though she knew where he was she would tell the patients she had no idea where he was, that he was out somewhere. She even told some patients that he was out with his secretary. She even told the children that the reason they didn't have any money or as much money as she thought they ought to have was because Dr. Renner was giving all his money to his secretaries. Dr. Renner also testified that she was vacuuming the floor at night, smoking in bed, jumping up and down in the bed. He was afraid she might attack him.

"He had been assaulted. She had kicked him in the area where he had had a hernia repaired but that it did no damage. She removed a key from his key ring in 1955, had taken it down to her attorney, Mr. Carney, and told Mr. Carney that it was the key to a girlfriend's apartment. When they moved to Paddington Road from that time on there was no social life. She would not go out with him and no one was invited to the home for the last five years they lived together at Paddington Road.

"Dr. Renner testified that his wife was a capable cook and housewife when she wanted to be but he would never know when she would fly off at the handle and living with her was like living on the top of a volcano.

"Letters were introduced, some admitted by Mrs. Renner and some denied by Mrs. Renner, letters that she had written to Dr. Renner's mother demanding return of bond money—I believe that it was deducted from Dr. Renner's service pay—saying that it was her money and she wanted it back. She also wrote to Dr. Renner's

mother and said that she knew—and this was before she knew evidently from the evidence that she subsequently produced—that she knew that Dr. Renner was running around with somebody and that she couldn't then prove it, but that she was going to catch that person, whoever it might be, and take what steps she thought she deemed necessary in order to punish that person.

"Dr. Renner also testified that Mrs. Renner made accusations to the director of the hospital that he was, in fact, running around committing adultery with nurses. She made the same accusations to, I think, the telephone operator, or receptionist at the hospital that Dr. Renner was, in fact, running around and committing adultery with other nurses, and this again, before she had any evidence that he was. She had even hired a detective when Mr. Carney was representing her and the detective reported back there was no suspicious conduct on the part of Dr. Renner.

"He testified that as a result of her conduct he became in his opinion, he thought he was becoming mentally ill and sought medical treatment because he could not carry on his practice. He thought he was losing his health and certainly he was losing his self-respect. He testified in October of 1959 when she woke him up at 4:00 o'clock, that he did feign a heart attack to test whether or not she would come to his aid. She did not and refused to call Dr. Freeman, refused to give him water and she sat in the chair and watched him.

\* \* \*

"Now Mrs. Renner takes the stand and, in effect, denies each and every allegation made by Dr. Renner, denies making phone calls to the office, denies making accusations against Dr. Renner, denies calling Linda a prostitute and, in effect, denies each and every statement made by Dr. Renner and his witnesses. She admits some of the letters that were written to Dr. Renner's mother and denies others. The Court feels that every one of the letters that were introduced were written by Mrs. Renner.

"Then she testifies that shockingly as far as the Court is concerned that she did not know Dr. Renner was a Catholic until she saw his dog tag, and for the record so that counsel and no one else will get a misunderstanding of this, the Court is not Catholic. She says that she would never have married him had she known he was a Catholic and this was very young in their married life. I don't know if she ever communicated that thought to Dr. Renner. I don't recall any testimony that she did, but if she felt that way about him then, it is somewhat easy to understand, with such little love that she evidently had for him by making such a statement as that, how this marriage was doomed to failure from the start.

"* * * There is no sense reviewing Mrs. Renner's testimony because what she did basically was simply deny everything Dr. Renner said and his witnesses. The Court believes Mrs. Renner told somewhat less than the truth. * * *

* * *

"She denied threatening Miss Pierelli, she denied calling anyone saying the doctor was out of town with secretaries, she denied calling the receptionist and asking what nurses the doctor was dating. She denied on interrogatories that she called her but admitted in court that she did. She admitted turning the key over to Mr. Carney because Dr. Renner's habits were suspicious.

"Mrs. Renner hired a detective in 1960 and they came up with zero. She employed some detectives in 1964 to check out the apartment over his office and they came up with zero.

"Then she calls Mrs. Balfour, her next-door neighbor who has known Mrs. Renner for ten years. They were nurses together and she said Mrs. Renner was a fine neighbor and friend and she has never seen anything irrational about Mrs. Renner's conduct, at least in the last two years, and that Mrs. Renner was very kind. They have dinner together, go to antique shows together and in general she thinks Mrs. Renner is a fine neighbor.

"Mrs. Hallam, the sister of the defendant, testifies she

gives Mrs. Renner $100.00 a month on a nurses salary and introduces fifteen checks. Then she testifies that she did not expect repayment and that they had no understanding about the fifteen $100.00 checks. That part of the testimony of Mrs. Hallam the Court completely disregards and disbelieves, and feels that Mrs. Hallam was not telling the truth. She testified that since 1965 she has seen her sister frequently, that her conduct was normal and she is a very stable person, but that she had had some difficulty with her husband.

\* \* \*

"The Court finds that the conduct of Mrs. Renner constituted constructive desertion, that had not Dr. Renner left the residence when he did that he would not have been able to keep his health, his self-respect, or his sanity, that he would not have been able to continue to function properly as an expert cardiologist, that his worth to society is worth saving for society. Everybody agrees that he is a fine cardiologist and has served his patients well. How he lived so long with Mrs. Renner is beyond me. I know that I could not have done it and the only reason I can think that he did it was because of his children, and it is a shame that it took so long for John to realize and become acquainted with his father. In fact, he did not become really acquainted with him, or even fond of him until after he left the Renner residence."

### Constructive Desertion

On appeal, Mrs. Renner argues that her conduct was largely, if not entirely, due to her mental condition. There was no such finding by the chancellor and, indeed, there is but little evidence to support such a finding had he made one. More importantly the position is contrary to that taken by Mrs. Renner below. Pursuant to Md. Rule 420, Dr. Renner sought to have Mrs. Renner submit to a mental examination by her former psychiatrist, Dr. Percy H. Sutley. The motion was successfully resisted on the basis that mental incapacity was not an

issue in the case and by her assertion that she was not an emotionally disturbed person; she pointed out she had not received psychiatric care for more than twelve years. Although there is some evidence that Mrs. Renner was suffering from an emotional disturbance prior to 1955, no testimony was adduced to show the conduct described by Chancellor McCullough was due to mental illness. Hearsay evidence was introduced, without objection, showing that about 1960, her then attorney had had her examined by two psychiatrists who found that she was emotionally stable. On this state of the record we decline to consider the question of what contribution, if any, Mrs. Renner's condition may have made to her misconduct. Md. Rule 1085.

We will, however, briefly distinguish the cases cited by the wife to support her argument. In *Luther v. Luther*, 233 Md. 92, 195 A. 2d 605, the Court simply approved the chancellor's finding that mental illness was the cause of the wife's behavior. In *Stecher v. Stecher*, 226 Md. 155, 172 A. 2d 515, the Court approved an implied finding that the wife's irrational behavior was due to mental illness and denied relief because "There is little evidence of violence and none at all as to interference with his business." 226 Md. at 160, 172 A. 2d at 517. In the latter case the Court cited *Ritz v. Ritz*, 188 Md. 336, 52 A. 2d 729, also relied on by the wife, as holding "the husband was not justified in leaving the wife because her reprehensible conduct, caused by a mental disturbance for which she had once been committed to The Sheppard & Enoch Pratt Hospital, did not sufficiently endanger his life and health as to justify his leaving her." 226 Md. at 159, 172 A. 2d at 517.

Mrs. Renner also argues that under the cases of *Ballan v. Ballan*, 251 Md. 737, 248 A. 2d 871 and *Beavers v. Beavers*, 255 Md. 450, 258 A. 2d 203, her conduct did not justify her husband in leaving her. In the latter case, the Court found that the wife's abusive language and charges of misconduct were made quietly and not outside the family circle and that there had been no showing

that her husband's health or safety were endangered. As pointed out by Judge McCullough in the instant case there were public charges of misconduct, public use of abusive language and ample evidence of danger to the husband's health or safety. Likewise in *Ballan v. Ballan, supra,* the testimony indicated only that the wife's conduct was unpleasant and there was no evidence to show that her husband's health was impaired. In the instant case, we fully agree with Judge McCullough's finding that not only was Dr. Renner's health impaired but the unfounded charges of infidelity to his employees and patients constituted conduct demeaning his self-respect, either one of which conditions would have justified his departure from the marital home. See *Bryce v. Bryce,* 229 Md. 16, 181 A. 2d 455; *Kruse v. Kruse,* 179 Md. 657, 22 A. 2d 475.[2]

### Counsel Fee—Appeal No. 521

Dr. Renner complains that the trial judge, J. Gilbert Prendergast, who decided the question of counsel fee, under agreement of the parties, allowed an excessive fee to Mrs. Renner's counsel. The fee was determined on the basis of a petition filed by Mrs. Renner's counsel requesting that he be granted a fee of $4,000. The contents of the petition will be recited in somewhat more detail than usual because our heretofore abbreviated treatment of the proceedings does not give an adequate indication of the variety of legal service involved.

The petitioner, C. Townsend Parks, Jr., asserted he was retained by Mrs. Renner on May 21, 1969, and that he entered his appearance on her behalf in five cases involving suits by creditors against both Dr. and Mrs. Renner involving a total sum of $1,400. At the time he was retained as counsel by Mrs. Renner, Dr. Renner had filed a bill of complaint for a divorce *a mensa et thoro* and a supplemental bill for divorce *a vinculo matrimonii.* He

---

2. Note, however, Md. Code, Art. 59, § 25, which sets up a new test for insanity when used as a defense in criminal cases.

answered those proceedings as well as a second supplemental bill seeking a divorce *a vinculo matrimonii* on the basis that the parties had lived separate and apart for five years. He filed on behalf of Mrs. Renner a bill of complaint for permanent alimony and custody of a minor child on the grounds of abandonment and adultery. He answered interrogatories filed on behalf of the husband and filed a set of interrogatories on behalf of the wife and that although no agreement was ever reached, he spent much time reviewing proposed settlement agreements prepared by counsel for the husband. Counsel reviewed detective reports which tended to support the evidence of the husband's adultery. He successfully opposed in open court, a petition filed by the husband requesting mental examination of his client. He made the customary preparation for trial, interviewing witnesses and reviewing financial data of the parties. He asserts that by order of Judge McCullough he was required to appear in Upper Marlboro for final argument which consumed half a day of his time. After appeal was filed from Judge McCullough's decision, he prepared a separation agreement which was rejected by the husband. The husband had an adjusted gross income of approximately $38,000 in the year 1970 and net assets of approximately $75,000; the wife's assets were approximately $9,000; he requested the allowance of $4,000 additional fee, saying he had been paid a retainer fee of $500 by the wife. These figures are as shown in the petition; the evidence discussed hereinafter indicates some discrepancies but they are not vital to this determination except to note the wife's assets amounted to approximately $39,000.

After a hearing, the trial judge refused to disallow counsel fees to Mrs. Renner's counsel on the basis that she had attempted a fraud on the trial court.[3] He found that the services rendered by the appellant's counsel were

---

3. This question will be discussed hereinafter in the second appeal.

reasonably worth $6,000 and directed the husband to pay three-fourths or $4,500, later reduced to $4,000.

The Doctor contends Mrs. Renner's counsel's activities resulted in no benefit to her as she did not obtain alimony because of her constructive desertion; and that although Dr. Renner was denied an absolute divorce on the basis of recrimination and denied a divorce on the ground of five years voluntary separation because the requisite conditions had not been fulfilled at that time, the divorce was granted a few weeks later. He also points out he voluntarily supported his wife since the separation in 1966. He questions the fact that counsel furnished no information to the court as to the actual hours worked. He challenges an allegation in the original petition that counsel had spent seven days in court, alleging that only one day was spent in court in connection with the suits for necessities; that half a day was spent before Judge Watts in connection with a motion for a mental examination; 2½ days were spent before Judge McCullough in final arguments on the merits. He also lists how his $38,-000 income was spent in an effort to show that he could not afford such a fee allowance.

On appeal Dr. Renner cites *Kapneck v. Kapneck*, 235 Md. 366, 201 A. 2d 798 and *Quinn v. Quinn*, 11 Md. App. 638, 276 A. 2d 425 alleging that those are the only two cases where Maryland Appellate Courts have allowed counsel fees in excess of $1,800. He refers to the more than $100,000 annual income and the assets of between $1,400,000 and $2,400,000 of the husband in *Quinn v. Quinn, supra,* pointing out that this Court allowed a counsel fee of only $10,000. He does not give the figures for *Kapneck v. Kapneck,* but in that case the husband's income at the time of trial was approximately $14,000 and his pre-marital separation income had been approximately $24,000; he was required to pay counsel fees of $3,000 even though $2,000 had already been paid from other sources. The chancellor found that the services rendered in the instant case had a value of $6,000. Mrs. Renner's counsel in a brief has stated, except for the

$500 he has already received, he intends to make no charge to Mrs. Renner for the services in the first case.

Although the time expended by the wife's counsel is not disclosed, the record does disclose proceedings which would of necessity have required much time. The chancellor thought they were reasonably worth $6,000 and we have no basis for saying they were not worth the $4,000 allowed in addition to the $500 already paid by the wife. Neither do we think the $38,000 income of the husband, nor his $75,000 in assets are so low that he should not be required to pay two-thirds of the value of the services rendered. See *France v. Safe Deposit & Trust Co. of Baltimore,* 176 Md. 306, 4 A. 2d 717, 727. Neither do we think the wife's assets of $39,000 are so large that she should be required to pay more than the $500 she has already paid. She has not been gainfully employed for a number of years and under our decision in the second case she will not be entitled to permanent alimony.

## APPEAL NO. 715

A few weeks after the appeal was noted in the prior case, Dr. Renner filed a second suit for a divorce *a vinculo matrimonii* on the ground that he and wife had then been separated for a period of five years. Mrs. Renner filed an answer and a cross bill claiming alimony *pendente lite* and permanent alimony. The trial judge awarded Dr. Renner a divorce and Mrs. Renner $200 per week in permanent alimony. Dr. Renner appealed contending the trial judge erred in refusing to consider the fault which destroyed the marriage and the circumstances which led up to the separation in considering the right to and the amount of alimony, and that counsel fees were excessive. Mrs. Renner did not appeal.

Before determining the effect of the decree in the prior case and the then pending appeal therefrom, we must determine whether or not the fault which destroyed the marriage is one of the factors which the chancellor must

consider in determining alimony where divorce is granted under the relatively new statute providing for a "no fault" divorce after the parties have lived separate and apart for a period of five years without cohabitation.[4] The statute by its express terms provides that recrimination and *res judicata* shall have no effect on the right to divorce. This does not, however, dispose of the question as to whether or not *res judicata* or recrimination shall be considered on the question of alimony. Very early in their existence, Maryland courts of equity were given the power to determine alimony in the same manner as determined by ecclesiastical courts of England. Md. Code, Art. 16, § 2. Somewhat later, they were permitted to award alimony in cases where "a divorce was decreed." Md. Code, Art. 16, § 3. The cases make clear that a wife can secure a decree for alimony if she has grounds for divorce either *a mensa* or *a vinculo* even though she does not ask for a divorce. *Moran v. Moran,* 219 Md. 399, 149 A. 2d 399; *Dackman v. Dackman,* 252 Md. 331, 250 A. 2d 60. Applying the doctrine of recrimination, Maryland courts deny a party a divorce—and alimony should that party be the wife—who has been guilty of a marital offense of equal magnitude as that complained of. *Courson v. Courson,* 213 Md. 183, 129 A. 2d 917; *Stenger v. Stenger,* 14 Md. App. 232, 286 A. 2d 552. See *Matysek v. Matysek,* 212 Md. 44, 128 A. 2d 627.

Maryland cases also hold a husband not liable to a third party for necessaries where the wife is guilty of desertion, *Kerner v. Eastern Hospital,* 210 Md. 375, 123 A. 2d 333, or adultery, *Dudley v. Montgomery Ward & Co.,* 255 Md. 247, 257 A. 2d 437.

In *Quinn v. Quinn,* 11 Md. App. 638, 643, 276 A. 2d 425, 427, a case involving desertion, this Court set forth

4. Md. Code, Art. 16, § 24, allows a divorce *a vinculo matrimonii* ". . . on the application of either party when the husband and wife have lived separate and apart without any cohabitation and without interruption for five years. A plea of *res adjudicata* or of recrimination with respect to any other provisions of this section shall not be a bar to either party obtaining a divorce on this seventh ground." (1969 amendment). As to the spelling of *res judicata* see Black's Law Dictionary. (4th Ed. 1957).

the holding of *Waters v. Waters*, 191 Md. 436, 62 A. 2d 250, in the following language:

> "[I]n determining an award of alimony and whether, under the statute, the wife's income 'is insufficient to care for her needs,' the court should consider the husband's wealth and earning capacity, the assets and income of the wife, the station in life of the parties, their age, physical condition, and ability to work, the length of time the parties lived together, *the circumstances leading up to the divorce, and the fault which destroyed the home.* To the same effect, see *Burton v. Burton,* 253 Md. 233; *Newmeyer v. Newmeyer,* 216 Md. 431." (Emphasis added).

In that case we were careful to point out that alimony was not awarded as a punitive measure but was an allowance to the wife in recognition of the husband's common law liability to support her. The principle that the fault of the wife should be considered in fixing alimony has been applied by the Court of Appeals in cases where the ground for divorce was voluntary separation for the requisite period of time.[5] *Foote v. Foote,* 190 Md. 171, 57 A. 2d 804, and such rule must be necessarily inferred from *Hughes v. Hughes,* 216 Md. 374, 140 A. 2d 649. Although the question whether or not fault should be considered under Maryland's relatively new five year separation statute has not been decided, it seems clear to us by analogy to the eighteen month voluntary separation statute, that fault of the wife should be considered in the determination of alimony in cases under the five year statute; otherwise, a wife guilty of deserting her husband, could live with an impecunious paramour, and after five years become eligible to collect alimony from her

---

5. Md. Code, Art. 16, § 24 recites the fifth ground for divorce in the following language: "when the husband and wife shall have voluntarily lived separate and apart, without any cohabitation, for eighteen consecutive months prior to the filing of the bill of complaint, and such separation is beyond any reasonable expectation of reconciliation."

husband. Surely the legislature in providing that the fault of either of the parties should not bar the other from acquiring a divorce after a separation for a period of five years did not intend that, in the example cited, the adulterous wife should be permitted to collect alimony from her husband. This seems to be the general rule throughout the country. See 34 A.L.R.2d 313. Our view that fault should be considered is further supported by a Court of Appeals decision which held that a wife receiving alimony under an *a mensa* decree must lose that alimony because of her subsequent adultery. *Courson v. Courson, supra.*

The wife argues that the Court in *Flanagan v. Flanagan,* 14 Md. App. 648, 288 A. 2d 225, held that the fault of the wife should not be considered on the question of alimony but we think the wife reads too much into *Flanagan.* In that case the chancellor denied the wife alimony on the basis that the husband was free of fault. We pointed out that under the five year statute the husband's lack of fault was not a factor in determining the wife's right to alimony or to a divorce. We were careful to point out, however, at page 656 as follows: "*Ergo,* a trial court is empowered to grant alimony to a wife *free of fault* in all cases where it is claimed, needed, and where a divorce is decreed." (Emphasis added). We also referred to *Hughes v. Hughes, supra,* and *Foote v. Foote, supra,* which recited that the fault which destroyed the home should be considered in fixing alimony where divorce was granted under the voluntary separation statute. We hold that recrimination is an available defense to the issue of alimony in a suit for divorce based on the non-fault ground of separation for five years. Accordingly, in granting and fixing the alimony in the instant case, the chancellor was in error for not giving consideration to the fault which destroyed the home.

There remains a question of the effect of the prior decree denying the wife alimony by reason of her constructive desertion of her husband. The wife argues that *Buehler v. Buehler,* 229 Md. 317, 182 A. 2d 877, is con-

trolling because the Court of Appeals held that the fact that the wife had been denied alimony in a prior suit, did not preclude her from obtaining alimony in a subsequent suit. In that case the wife brought suit and the husband filed a cross bill, both praying a divorce *a mensa;* she on the ground of desertion, he on constructive desertion and cruelty. The chancellor dismissed both of the bills. Later the husband brought a bill of complaint seeking an absolute divorce on the ground of voluntary separation. He was awarded his decree but the court "reserved for future hearing" the question of alimony. The Court of Appeals held that the decision in the first suit was not *res judicata* to the issue of alimony because the first case merely determined that there had been no desertion up to that time—not that there could not be a subsequent divorce on some other ground and possible alimony. We do not think *Buehler* has any application to the instant case wherein the chancellor in the prior suit held that the wife was guilty of constructive desertion for a period of 18 months and therefore denied her alimony. In Maryland it is well settled that when a wife is guilty of a recriminatory offense warranting a decree *a vinculo* against her, her claim for alimony is barred when the suit is based upon desertion for 18 months or adultery. See *Matakieff v. Matakieff,* 246 Md. 23, 226 A. 2d 887, *Wardrop v. Wardrop,* 211 Md. 14, 124 A. 2d 576; *Courson v. Courson,* 208 Md. 171, 117 A. 2d 850; *Stenger v. Stenger, supra.* We think in the instant case the prior decree finally determined that the wife was not entitled to alimony and that the decree cannot be collaterally attacked.

In the case of *Hughes v. Hughes,* 213 Md. 452, 132 A. 2d 119, the Court of Appeals held that the husband was entitled to a divorce on the basis of voluntary separation for the statutory period and that the wife was entitled to alimony. Thereafter he sought to relitigate the question of alimony alleging that his wife was guilty of adultery prior to the decree in the earlier proceeding and therefore her right to alimony would be barred under *Courson*

*v. Courson,* 213 Md. 183, *supra.* In *Hughes v. Hughes,* 216 Md. 374, 140 A. 2d 649, 652, the Court rejected the argument saying:

> "In 17 Am. Jur. 'Divorce and Separation', § 719, p. 764, it is stated: '* * * all questions concerning alimony which are or ought to be determined in a divorce proceeding are *res judicata* in a subsequent proceeding in the same jurisdiction. This is equally true where the terms of the decree, relative to alimony, were incorporated by the court at the suggestion and with the consent of the parties.' If not *res judicata,* the right to alimony was at least judicially determined, and thus became the law of the case. Cf. *Plank v. Summers,* 205 Md. 598, 602, 109 A. 2d 914. This would be true even if the allowance had been contested and decided contrary to the appellant's contention. If every adjudication were open to review after it has been affirmed on appeal, there would be no finality or end to judicial proceedings, and we see no reason to make an exception in the case of the right to alimony, even though the Chancellor retains a measure of control over its modification in the light of changed conditions."

In *Stansbury v. Stansbury,* 223 Md. 475, 164 A. 2d 877, the Court held that after a decree awarding alimony becomes final, it is binding on the parties unless there occurs a "material change in circumstances." See also *Stein v. Stein,* 251 Md. 300, 247 A. 2d 266, where the Court held that a prior decree granting the husband a divorce *a mensa* on the ground of the wife's desertion was binding against the wife in subsequent *a vinculo* proceedings instituted by the husband "as to the lack of justification of the wife for leaving the home of the parties." We can see no reason why a wife, once denied alimony because she who has been determined to be guilty of adultery or desertion for a period of 18 months, should

be permitted to relitigate her right to alimony in subsequent proceedings.

## Other Issues

Since we have determined the wife's right to alimony has been finally litigated and resolved against her, there is obviously no need for us to discuss the question of the amount of alimony or its denial on other grounds. There remains however, a question as to the amount of the counsel fee awarded in the second proceeding.

The record shows that Mrs. Renner has a net worth of approximately $39,000. Dr. Renner has a net worth of approximately $85,000 or $90,000 with a gross income of $36,000 or $37,000 per year. Mrs. Renner is not employed. On a claim by the wife's counsel that he had spent approximately 50 hours in the preparation and trial of the second case below, the trial judge awarded a total fee of $2,500, one-half to be paid by the husband. He also awarded a fee to cover the appeal in both cases in the amount of $3,000. In *Quinn*, 11 Md. App., *supra*, we quoted from *Lopez v. Lopez*, 206 Md. 509, 520-521, 112 A. 2d 466, 471, as follows: "[T]he court should take into consideration the financial circumstances of the parties, and determine the amount in accordance with the wife's necessities and the husband's financial ability, and allow an amount that will afford the wife an efficient presentation of her side of the controversy." Using the amount of fees awarded in two recent reported cases as a guide, it seems that in considering the financial circumstances of the parties, the instant fees were greater than usually allowed. See for examples *Schuman v. Schuman*, 252 Md. 13, 248 A. 2d 876 and *Quinn*, 11 Md. App., *supra*. We think each of the fees in Appeal No. 715 should be reduced by 50%.

The husband argues the wife's attorney should not be allowed any counsel fees under a principle set out in *Pavlicka v. Pavlicka*, 202 A. 2d 200 (N.J. Super. App. Div. 1964) because the wife and counsel had "unclean

hands." Regardless of the soundness of the legal proposition urged upon us, and we do not decide that question; the record does not give a factual basis on which the principle could be applied. At the initial trial, Mrs. Renner introduced checks from her sister in the amount of $100 a month over a period of time, she testified that the money was loaned to her by her sister so that she could meet her day-to-day expenses. The sister testified that the money was a gift and not a loan but the trial judge indicated he did not believe that part of the sister's testimony. The sister's testimony did corroborate Mrs. Renner's as to the source of the funds and it is easy to understand how a misunderstanding as to the nature of the transfer could occur between such close relatives. At the original hearing before Judge Prendergast as to the counsel fees in the original suit, it was indicated that a niece of Mrs. Renner, who had undergone medical treatment, testified that her mother and Mrs. Renner collusively manufactured the payments and that Mrs. Renner returned the money after the checks were cashed. Judge Prendergast indicated that the niece's testimony, in view of her medical treatment, would have been highly suspect and that he did not think fraud was involved. We concur.

> *Decree and order in Appeal No. 521 affirmed.*
> *In Appeal No. 715, award for alimony reversed; order as to counsel fees modified in accordance with opinion.*
> *Husband to pay costs in both cases.*