JACK E. RICHARDSON *v.* NORMA GENE
RICHARDSON

[No. 551, September Term, 1972.]

*Decided May 2, 1973.*

666

The cause was argued before ORTH, C. J., and SCANLAN and DAVIDSON, JJ.

*Thomas A. Lohm* for appellant.

*Robert E. Bullard,* with whom were *Bullard & Deutchman* on the brief, for appellee.

SCANLAN, J., delivered the opinion of the Court.

On August 9, 1971, the appellee, Norma Gene Richardson, filed a bill of complaint in the Circuit Court for Montgomery County, seeking a divorce *a mensa et thoro* from her husband, the appellant, Jack E. Richardson.

Her divorce action alleged constructive desertion by the appellant and also sought to impress a trust on real property which the couple had purchased in January, 1960 shortly after their marriage in 1959 and where they lived as husband and wife until the break up of their marriage in June 1971. This property, it appears, had been conveyed to the appellant in his name alone when acquired by the parties in 1960. On September 20, 1971, the appellant answered the wife's action, disputing all the essential allegations of the bill of complaint, and filed a cross bill seeking a divorce on the ground of desertion by the appellee.

The trial judge filed a written opinion and order on July 27, 1972, followed by a "Final Decree" issued on August 10, 1972, holding that the appellee was entitled to a divorce *a mensa et thoro* and denying the appellant's cross bill for divorce. The chancellor's decree also granted the appellee alimony and monthly support for two minor children born of their marriage, provided for reasonable visitation rights and ordered the appellant to pay a total of $600.00 towards the wife's counsel fees. His order also appointed a trustee and directed him to convey the interests of both parties in their home to the appellant and the appellee as joint tenants.

This appeal presents the following questions: .

1. Was the evidence sufficient to support a finding that the appellant engaged in persistent homosexual conduct which so impaired his wife's safety and health and demeaned her self-respect as to amount to constructive desertion of the home on the part of the appellant entitling her to a divorce *a mensa?*

2. Was the appellant entitled to a divorce *a mensa* on the ground of desertion by the wife?

3. Were the trial court's awards of alimony, child support and counsel fees to the appellee excessive?

4. Did the court below err in directing that the real estate, originally conveyed to the appellant alone, be conveyed to the appellant and the appellee as joint tenants?

I

## THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH CONSTRUCTIVE DESERTION ON THE PART OF THE APPELLANT

This Court has had several occasions to discuss the law of constructive desertion in Maryland. *Binder v. Binder*, 16 Md. App. 404, 297 A. 2d 293 (1972) ; *Renner v. Renner*, 16 Md. App. 143, 294 A. 2d 671 (1972) ; and *Bryant v. Bryant*, 16 Md. App. 186, 294 A. 2d 467 (1972). In *Bryant*, we referred to and applied the controlling decision of the Court of Appeals in *Scheinin v. Scheinin*, 200 Md. 282, 89 A. 2d 609 (1952). In delineating the principles of law governing the grant of a divorce on the ground of constructive desertion, the Court of Appeals held in *Scheinin* that:

> "It is accepted that any conduct of a husband that renders the marital relation intolerable and compels the wife to leave him may justify a divorce on the ground of constructive desertion, even though the conduct may not justify a divorce on the ground of cruelty. *Sullivan v. Sullivan*, 199 Md. 594, 600, 87 A. 2d 604, 607. Any misconduct of the husband will justify the wife in leaving him when it makes it impossible for her to live with him without loss of her health or self-respect, or gives her reasonable apprehension of bodily injury. If the husband's misconduct has been such as to render continuance of the marriage relation unbearable, justifying the wife in leaving him, he is the one who is guilty of desertion." *Id.* at 290.

The principles set forth in *Scheinin* remain the law of this State. *Bryant* at 190; *see also Murphy v. Murphy*, 248 Md. 455, 237 A. 2d 523 (1968). To prevail in the case at bar, therefore, the appellee must show that she was legally justified in leaving her husband because by his conduct he had demonstrated a pattern of persistent cruel or offensive conduct which was so demeaning to her self-respect as to be intolerable. *Neff v. Neff*, 13 Md. App. 128, 133, 281 A. 2d 556 (1971). Thus, in *Soles v. Soles*, 248 Md. 723, 238 A. 2d 235 (1968), the Court of Appeals held that a practice of abnormal sexual relations by one spouse and his demand that it be continued justified the wife in leaving the marital domicile in order to preserve her health and self-respect.

Although there are no reported cases on the precise point in Maryland, it may well be that, in a case where the evidence justified it, a pattern of homosexual activity on the part of one spouse could be so demeaning to the self-respect of the other that the latter would be justified in leaving the household. *Divorce—Homosexuality as Ground*, 78 A.L.R.2d 828 (1961); *see also, e.g., H. v. H.*, 59 N. J. Super. 227, 157 A. 2d 721 (1959). The case last cited involved lesbian activities on the part of a wife. In reversing the judgment denying the husband a divorce, the New Jersey court concluded that "it is obvious that some kinds of cruel conduct are so patently injurious in nature as to permit relatively less exacting proof of the resulting deleterious consequences [to the marriage], the acts themselves being clearly calculated to produce reactions in the injured spouse incompatible with a continuance of the marriage relationship and inimical to his mental or physical welfare." *Id.* at 727. In the instant case, however, the evidence falls short of showing that the wife proved, by a preponderance thereof, any pattern of homosexual conduct on the part of the appellant sufficiently harmful to her health and demeaning to her self-respect as to constitute constructive desertion on the part of the husband.

There was testimony by the appellee that she had been

informed by neighbors in the early winter of 1970 that her husband had sexually molested two young boys and, about the same time, had been told by her brother that the appellant had committed a sexual act on his person. The husband denied these accusations, but agreed to be tested by a clinical psychologist. He was tested on December 6, 1970. The psychologist's report is found in the record. The report is not conclusive but does find that no "test signs of psychosexual deviation were . . . specifically seen . . . ." The report also states that "evaluation of the wife herself would be important in finally arriving at what . . . happened . . . ." The appellant disclosed the results of the clinical test to his wife. The appellee left the home on June 25, 1971.

In his opinion, the chancellor referred to the "husband's conduct toward young males." As we now show, the evidence to support this guarded derogatory observation is sparse at very best. Approximately three years before the appellee left the appellant, her husband had visited a tent in the back yard of a neighbor where two young boys, then ages 16 and 14, were present. At the hearing in the court below, the 16 year old boy testified about an occurrence which took place in the tent at the time the appellant had visited there. The boy's testimony was as follows:

"Q  And what happened?
A  He came over, and he sat down at first and then he laid down with his arm under him on my chest.

\* \* \*

Q  And what else, if anything, did he do?
A  Well, we just laid there for a while, and he would — he was breathing; as he would breathe, as he exhaled, his hand would move down each time."

On cross examination the boy was asked:

"Q  And then you indicated that he would

breathe and his hand would just move a little bit; is that it?

A Yes.

Q *That was the extent of it?*

A Excuse me?

Q *Is that what happened? His hand moved a little bit?*

A. *Yes."* (Emphasis added.)

The 14 year old boy who had been in the tent on the evening in question did not testify at trial, but his deposition was entered into evidence. His testimony was as inconclusive as that of the 16 year old, so far as proving the commission of a homosexual act on the part of the appellant. The witness testified as follows:

"Q Would you state what happened?

A I was spending the night in the back yard and Mr. Richardson came over. *It seemed harmless enough.* We were just talking and, you know, carrying on a normal conversation, and he started lounging and laying back, putting his head on my lap and things like that. *Really not too much occurred other than that* because I felt uneasy about the whole situation—." (Emphasis added.)

At trial, there was testimony by one witness indicating that the appellant had committed a homosexual act during the course of his marriage to the appellee. The appellee's brother, age 34, testified that in the late fall or early winter of 1970, he told his sister, appellee, about an episode which occurred in late fall of 1965 or early winter of 1966. This witness testified that at that time he and the appellant had driven down to his parents' place in St. Mary's County to check the condition of the house and boat. The two men stayed overnight in the house and, because there was no central heat, slept together in one bed. The appellee's brother testified that on that night the appellant tried to masturbate him. He

further testified that he did not say anything to the appellant at the time of the incident and never repeated the story until he told it to his sister, the appellee, over four years later.

The husband testified that he had never molested either of the two boys whose testimony was taken, and that he did not remember being in the tent with them. He also denied that he attempted at any time to masturbate his wife's brother. There was also testimony that the appellant owned a boat which he chartered out to fishing parties and that he hired a 15 year old boy to serve as mate on the boat because his own stepson was not interested in the boat. Appellant denied having engaged in sexual misconduct with this 15 year old boy or with any other male.

In contending that the evidence established a pattern of homosexual conduct sufficient to justify the wife leaving the home, the appellee argued, and the court below was persuaded, that *Crissman v. Crissman*, 281 A. 2d 719 (Pa. Super. 1971), furnishes analogy for this case. We disagree. *Crissman* involved an action for support brought by a wife who alleged that her husband had made immoral advances toward her 14 year old son by a previous marriage. In *Crissman*, there was testimony that: (1) on one occasion the husband asked the boy to go to bed with him; (2) at one time the husband, dressed only in his undershorts, lay down on top of the boy and after moving around became sexually aroused; (3) despite an ultimatum from the wife, another similar incident occurred; (4) the husband's testimony not only failed to controvert the wife's allegations but partially corroborated them.

*Crissman* is clearly distinguishable. There was present in that case a course or pattern of undisputed, continuing sexual deviate conduct. In the case at bar, there is testimony of a *single* homosexual incident which the appellant denied. Finally, *Crissman* was an action for support not for divorce. The Pennsylvania court stated that:

> "The law is well settled in Pennsylvania that a wife seeking support has the burden of establishing that her husband's conduct justified her withdrawal from the marital domicile or that the husband consented to the separation. *However she need not establish facts which would entitle her to a divorce.* 281 A. 2d at 721 (emphasis added).

We decline, therefore, to hold that the evidence of a single homosexual action during eleven years of a marriage is sufficient to demonstrate a "pattern of *persistent* [homosexual] conduct." *Murphy v. Murphy, supra* at 460. To the extent that the chancellor's opinion rested on an implied finding to the contrary, it was clearly erroneous. Accordingly, unless there is other evidence to support it, the trial court's conclusion "that the husband's conduct constituted indignities which were injurious to [the wife's] . . . health, safety and self-respect" must fail. We find no such other supporting evidence in the record.

The chancellor referred to "lack of any sexual intercourse" between the parties during the last years of their marriage. On this point, however, the evidence indicates that there was no testimony on the part of the wife that her husband ever refused to have sexual intercourse with her. On the other hand, the husband testified that sexual relations between the parties ceased in 1970 because she refused him and that thereafter, although he frequently attempted to have relations, the appellee continued to refuse him up to the time she left the home on June 25, 1971. Absence of sexual relations will not suffice to establish constructive desertion; there must be a showing of a refusal on the part of the spouse who declines to participate. *Fortman v. Fortman,* 250 Md. 355, 243 A. 2d 517 (1968). No such showing was made by the appellee.

The final evidentiary peg on which the chancellor based his conclusion that the wife was justified in leav-

ing the home was the appellant's "failure to disclose over the entire period of their married life that he had put the house in his name alone . . . ." As we point out in a subsequent section of this opinion, the fact that the house was conveyed to the husband alone does not appear to have been due to circumstances at which he contrived. Of course, the fact that he did not arrange for the conveyance to be made to him alone does not excuse his failure to disclose it to his wife. Standing by itself, however, we cannot say that his lack of candor in failing to disclose the conveyance to him amounted to a "pattern of persistent conduct" which was so detrimental to the health of the appellee or so demeaning to her self-respect as to be intolerable. A lack of candor on the part of a husband, no more than "mere marital indifference or lack of demonstrated love, or rudeness or expressed desire to end the marriage relation, will not legally justify the other spouse's departure from the marital household however intolerable such conduct may appear to be to the demeaned spouse." *Bryant, supra* at 191.

The fact that the appellee may have viewed as intolerable her husband's failure to disclose that their home was titled in his name alone during the years of their marriage is not sufficient to support the chancellor's grant of a decree of divorce *a mensa* to her. The law of Maryland does not countenance the separation of husband and wife except for grave and weighty reasons. *Neff, supra* at 133; *see also Beavers v. Beavers,* 255 Md. 450, 258 A. 2d 203 (1969).

For the reasons discussed in this section of our opinion, we hold that the trial court was clearly erroneous in awarding a divorce *a mensa et thoro* to the appellee on the ground "that the husband's conduct constituted indignities which were injurious to her health, safety and self-respect."

## II

## THE APPELLANT WAS ENTITLED TO A DIVORCE A MENSA ET THORO ON THE GROUND OF DESERTION

As stated, her husband's conduct furnished insufficient cause for the appellee to abandon the home. Her own testimony indicated that she left with the firm intention of not returning and also showed that she refused to have sexual relations or cohabit with him from the summer of 1970 until she left on June 25, 1971. Accordingly, the husband was entitled to a divorce *a mensa et thoro* on the ground of desertion. *Ballan v. Ballan,* 251 Md. 737, 248 A. 2d 871 (1969) ; *Binder v. Binder, supra.* It was error for the chancellor to have dismissed the appellant's cross bill praying a divorce on that ground. Upon the return of our mandate in this case, the trial court shall enter a decree awarding a divorce *a mensa et thoro* to the appellant, as prayed for in his cross bill.

## III

## ALIMONY, CUSTODY, SUPPORT AND ATTORNEY'S FEES

In his final decree granting a divorce *a mensa et thoro* to the appellee, the chancellor ordered the appellant to pay her the sum of $275.00 monthly as alimony. With the collapse of appellee's divorce action because of her failure to prove constructive desertion by the appellant, the appellee's right to alimony is extinguished. *Cf. Binder, supra* at 406. "In proceedings for permanent alimony or separate maintenance the same requirements as to proof, including corroboration, are necessary as where a divorce is sought." *Schriver v. Schriver,* 185 Md. 227, 241, 44 A. 2d 479 (1945).

With respect to the chancellor's award of custody of the couple's minor children to their mother, the appellee, the record shows that the appellant did not challenge the

appellee's fitness or right to custody, either in the court below or on this appeal. We see no reason to disturb this part of the trial court's decree. The custody of minor children is a particular concern of courts of equity by virtue of Article 16, Sections 25 and 66, "and may be exercised whether a divorce is granted or denied." *Jackson v. Jackson*, 13 Md. App. 725, 733, 284 A. 2d 654 (1971).

We also perceive no basis for reducing the chancellor's award to the appellee of $200.00 per month for the support of the two minor children born of her marriage to the appellant.[1] In making that award, "the court was acting within its jurisdiction, notwithstanding the fact that this Court has now invalidated that part of the decree which granted the divorce to the appellee." *Jackson, supra* at 734. We also cannot say that the court's award of support was excessive in amount. The appellee is unemployed; the appellant is a regular employee of the Kensington Fire Department, a captain, who earns a gross income of $18,763.00. He supplements that income by operating his charter boat, an activity through which he realizes approximately $2,000 more a year. It appears that the appellant has a net income of $1,287.00 per month. At the same time, the appellee receives only $142.00 a month from the United States Government for the benefit of the minor child by her previous marriage.

The principal considerations in making an award for the support of a child are the needs of the child and the financial circumstances of its father. *Rothschild v. Strauss*, 257 Md. 396, 263 A. 2d 511 (1970). Under those standards, the chancellor did not err in awarding $200.00 monthly to the appellee for the support of the two minor children born of the marriage. Rule 1086. Moreover, in view of the fact that the appellee is not

---

1. Mrs. Richardson receives a total of $142.00 per month from the United States Government (Social Security and Veterans Administration) for the support of her minor child by a former marriage.

entitled to alimony because of a failure to establish constructive desertion by the appellant, the chancellor, on remand of the case, should consider whether additional support beyond $200.00 per month is warranted.

The domestic relations master awarded $200.00 to the appellee for initial counsel fees and in his decree the chancellor supplemented that sum by another $400.00, for a total of $600.00 in counsel fees to be paid to the wife's attorney by the appellant. He challenges that amount as "exhorbitant."

In determining the amount of counsel fees to be paid by a husband to his wife's attorney, the court "should take into consideration the financial circumstances of the parties, and determine the amount in accordance with the wife's necessities and the husband's financial ability and allow an amount that will afford the wife an efficient presentation of her side of the controversy." *Quinn v. Quinn,* 11 Md. App. 638, 652, 276 A. 2d 425 (1971). The record indicates that there were two full days of hearings in the trial court, a hearing before the domestic relations master, five depositions and one set of interrogatories in this case, in addition to the pleadings and motions filed. Opposing counsel were kept busy. Moreover, it appears that the wife's income "was insufficient to care for her needs." Article 16, Section 5A of the Maryland Code. Therefore, considering the legal efforts expended by appellee's trial counsel and in view of the comparative circumstances of the parties, the chancellor adhered to proper principles in the award of attorney's fees which he made in this case. We will not disturb his award, since we cannot say that "he exercised his discretion arbitrarily or [that] his judgment was clearly wrong . . . ." *Flanagan v. Flanagan,* 17 Md. App. 90, 299 A. 2d 520 (1973) ; *see also Danziger v. Danziger,* 208 Md. 469, 475, 118 A. 2d 653 (1955).

## IV

## THE EVIDENCE IS SUFFICIENT TO SUPPORT THE TRIAL COURT'S FINDING THAT THE PARTIES INTENDED A CONVEYANCE OF THE REAL ESTATE TO HUS- BAND AND WIFE JOINTLY

In her bill of complaint the appellee requested the chancellor to impress a trust upon, and to order the ap-pellant to convey to her, an undivided one-half interest as a joint tenant in real property, designated as Lot 7, Block 55, Wheaton Woods, Montgomery County, Mary-land.[2] After hearing the evidence on this issue, the court below concluded that, although the property had been conveyed to the appellant in the latter's name alone in January 1960, "it was the obvious intent of the parties to put the home in joint names, with the right of sur-vivorship . . . ." In his final decree, the trial judge appointed a trustee and directed the latter to convey the interest of both parties in the said real estate to the appellant and the appellee as joint tenants. Appellant disputes that the evidence was sufficient to support the court's order appointing a trustee to convey the real estate as directed.

Standing alone, appellee's request to require appel-lant to convey real estate would be beyond our present jurisdiction. Nevertheless, we think that our appellate jurisdiction in this situation is established. In *Brody v. Midgette,* 16 Md. App. 647, 299 A. 2d 124 (1973), we took jurisdiction of an appeal in an action for child support which also sought the partition of real estate which the parties to the action owned as tenants in common. What we said in *Brody* is applicable here and supports our jurisdiction over the appeal of the issue

---

2. Although Article 16, Section 29, authorizes a court granting a divorce to determine questions arising between the parties in connection with the ownership of personal property only, Rule 313 (a) (Joinder of Claims) supports the jurisdiction which the trial court exercised over the separate claim relating to the real estate.

arising from the chancellor's order directing a conveyance of the real estate to the appellant and the appellee as joint tenants:

"We read Code, Art. 5, Section 5A (10) to mean that we have appellate jurisdiction of any case, suit, or proceeding in which any prayer or claim is asserted for any relief specified in the section, and that such jurisdiction extends to the whole case, including those aspects of which we would not have jurisdiction if they stood alone." *Id.* at 652.

The post office address of the real estate in question is 13411 Tangier Place, Rockville, Maryland. The evidence disclosed that the parties moved into this property on a rental basis immediately following their marriage in 1959. The parties attended the settlement on the subject property on January 13, 1960, held at the offices of William B. Wheeler, Esq., a Montgomery County real estate attorney, who then was handling title examinations of real estate and settlements.

At the time of the settlement the wife-appellee was nineteen and the husband-appellant thirty-three years old. At the settlement, and in the presence of her new husband, the appellee signed all of the papers which were presented to her. At the hearing in the trial court, Mr. Wheeler's settlement file was introduced into evidence. It reveals that all settlement papers which bear the appellant's signature also bear the signature of the appellee. Included among such papers was a voided deed of trust note and a voided corporate deed from the Donley Construction Company, the former owner of the property. Each of these two documents showed Mr. and Mrs. Richardson to be the owners as tenants by the entirety. Although these two documents had been signed by both parties, there was no explanation why, or when, they were voided.

Also found in the settlement file was a warranty of completion of construction signed by the president of

Donley Construction Company on January 13, 1960, the seller, and listing the purchasers as "Jack E. Richardson and Norma G. Richardson." There is also an acknowledgment receipt on the warranty, dated January 13, 1960, and signed by the appellant and appellee as "purchasers." A guarantee of a dry basement for a period of one year, also signed by the president of the Donley Construction Company, was acknowledged on January 13, 1960 by Mr. and Mrs. Richardson as purchasers.

A copy of the title insurance policy was entered into evidence. The policy, which insured Interstate Building and Loan and the Administrator of Veterans Affairs, stated that the deed of trust covering the property was a deed of trust from Jack Elwyn Richardson and Norma G. Richardson, his wife. This coincided with the application for title insurance which was in both their names.

The settlement file also contained a carbon copy of a deed of trust from Jack E. Richardson and Norma G. Richardson to Weaver Brothers, Inc., covering the Wheaton Woods property. This copy bears a typewritten notation at the bottom of the first page that "the said Norma G. Richardson joins in this conveyance for the sole purpose of conveying her inchoate dower right." The notation is in different type and rests at an angle to the other typewritten material on the deed of trust. At the trial, the appellee testified that she did not remember that notation as being on the instrument when she signed it on the day of settlement. Both the appellant and the appellee testified that they signed no additional papers after those which they executed at settlement and that they were not notified of any alterations in the deed of trust.

A corporate deed conveying the property from Donley Construction Company to Jack Elwyn Richardson, dated January 13, 1960, was entered in evidence by the appellant. The husband testified that he received this deed, addressed to him at 13411 Tangier Place, in an envelope from the Clerk of the Circuit Court of Rockville, Mary-

land, postmarked February 24, 1960. The deed indicates that it was recorded in the Clerk's Office on February 21, 1960.

The appellee testified that she had no notice that the deed to the real property was not in the joint names of her husband and herself until April 1971, when her husband told her of this fact during a heated argument. The husband did not deny telling her at that time, but testified that he kept the deed in his desk drawer at all times where it could have been seen by her, as his desk was never locked. The appellant did not say that his wife had ever seen the deed, although he claimed that during the course of their marriage she knew that the property was titled in his name alone.

The appellant was called by the appellee as an adverse witness. He testified that most of the property held by his wife and himself was jointly held, *i.e.*, personal property in the house, their two cars, and bank accounts. When asked about the deed and deed of trust which were voided, he testified as follows:

"Q *Was it your intention that they be voided?*
A *No, I didn't void those,* so I would have no intention one way or the other." (Emphasis added.)

He then was asked:

"Q When did it first come to your attention that the house was not in your wife's name as well as yours?
A At the time we received the deed."
(The deed was received over one month after settlement.)

During the course of appellant's examination by his own counsel, the following occurred.

"Q *Now, did you at any time ever intend that your wife have an interest in this particular real estate at the time of settlement?*

A *Obviously, as man and wife, if anything happened to me, certainly it would be hers.*

Q What do you mean by that?

A *Well, anything I would own would go directly to her."* (Emphasis added.)

Neither side offered as evidence the deed of trust note which replaced the voided note found in the settlement file. As a result, neither the trial court nor we can be certain whether or not the replacement note was signed by the appellant alone or signed by both Mr. and Mrs. Richardson.[3]

During their marriage, the wife turned over to her husband for deposit in their joint account the monthly checks she received from Social Security and the Veterans Administration (totaling $142.00 a month) for the support of her son by a previous marriage who lived in the parties' home.

It was on the basis of this combination of documentary and testimonial evidence that the chancellor concluded that it was "the obvious intent of the parties to have the home in joint names with right of survivorship . . . ." We cannot say that he erred in so concluding. Husband and wife occupy a confidential relationship.

---

3. The evidence, however, permits the reasonable surmise that the mortgagee, Weaver Brothers, Inc., upon receiving the promissory note signed by Mr. and Mrs. Richardson, objected to it on the ground that Mrs. Richardson was a minor and returned the note, by certified mail, which the Montgomery Title Company received on January 21, 1960. Although Mrs. Richardson was only nineteen at the time, she was an emancipated minor, and under then Article 21, Section 3 of the Code (1957), repealed in 1972, was authorized to join with her husband in an instrument of conveyance, either a deed or mortgage, to the same extent as if she had attained her majority. Nevertheless, for whatever reason, it appears that the deed and deed of trust note were voided after settlement and, apparently, the deed of trust then altered. Thereafter, a new note was executed, very likely by Mr. Richardson alone. All of this could have taken place without the appellee's knowledge, since her signature would not have been required either on the replacement deed, the replacement note, or on the altered deed of trust. On his part, the appellant testified that he could not recall signing any other papers except those which were executed at the settlement. It is probable, however, that he did execute a replacement deed of trust note.

*Gurley v. Gurley*, 245 Md. 393, 398, 226 A. 2d 276 (1967). A duty of mutual candor between them exists. Apart from the reasonably compelling documentary evidence found in the settlement file, the appellant's own testimony supplies strong indication that at the time of settlement he intended that the home which the newly married couple were acquiring was to be held jointly. A court of equity should deal with substance rather than form. *Miller v. County Commissioners of Carroll County*, 226 Md. 105, 117, 172 A. 2d 867 (1961). For some reason, not completely discernible from the record and, so far as we can ascertain, neither through the design nor connivance of the appellant, title to the Tangier Place property ended up in his name alone, even though that was not a result originally intended by him or his wife.

Equity, it has often been said, regards that as done which ought to have been done. *The Newark Trust Co. v. The Talbot Bank of Easton, Maryland*, 217 Md. 141, 148, 141 A. 2d 516 (1958). That ancient axiom of equity has applicability in this case. There was testimony which, if believed by the trial judge, shows it to have been appellant's original intent that the property was to be held jointly by his wife and himself, with right of survivorship. On that basis, the court below impressed a trust on the property, appointed a trustee and directed the latter to convey the property to the appellant and the appellee as joint tenants.

We cannot say that the trial court's findings of evidentiary or ultimate fact on this issue were clearly erroneous. Rule 1086. He heard the conflicting testimony concerning the conveyance and observed the demeanor of the witnesses, especially that of the appellant and the appellee. Credibility played a significant part in his decision. Accordingly, we shall not displace the chancellor's findings on the issue of the acquisition of the Tangier Place property even though we might have arrived at a different conclusion on the same evidence. *Nichols v. State*, 5 Md. App. 340, 247 A. 2d 722 (1968).

## CONCLUSION

In summary, we hold: (1) that there was insufficient evidence of constructive desertion to support the trial court's award of a divorce *a mensa et thoro* to the appellee; (2) that on the proof adduced at the hearing it should have granted a divorce *a mensa et thoro* to the appellant on the ground of desertion; (3) that the award of alimony to the appellee falls with her divorce action; (4) that the chancellor's awards of support and attorney's fees to the appellee were within his jurisdiction to grant and were not excessive in amount; and (5) that the trial judge did not err in appointing a trustee with direction to convey the real property to the appellant and appellee as joint tenants.

*Judgment reversed in part and affirmed in part in accordance with this opinion; case remanded for further proceedings in accordance with this opinion; appellant to pay the costs.*